RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0376p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

  *v.*

           No. 07-5696

BRUCESTAN T. JORDAN,

    *Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00165—Aleta Arthur Trauger, District Judge.

Argued: September 16, 2008

Decided and Filed: October 15, 2008

Before: MOORE and COLE, Circuit Judges; GRAHAM, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David L. Cooper, THE LAW OFFICE OF DAVID L. COOPER, Nashville, Tennessee, for Appellant. William Lee Deneke, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** David L. Cooper, THE LAW OFFICE OF DAVID L. COOPER, Nashville, Tennessee, for Appellant. William Lee Deneke, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

  KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant, Brucestan T. Jordan ("Jordan"), appeals his conviction for mail fraud (Count 1) in violation of 18 U.S.C. § 1341[1] and

---

[*] The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

[1] Section 1341 prohibits the use of the mail "to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341.

aggravated identity theft (Count 2) in violation of 18 U.S.C. § 1028A(a)(1),**2** as well as his sentence to forty-eight months in prison on Count 1.  Jordan makes several arguments before this court: (1) that there was a violation of the Speedy Trial Act's requirement that a defendant be indicted within thirty days of his arrest; (2) that evidence was unlawfully seized from his vehicle incident to a warrantless arrest without probable cause; (3) that the district court erred in refusing to appoint standby counsel to assist Jordan's *pro se* defense at trial; (4) that the district court failed properly to exercise its discretion under Rule 16 of the Federal Rules of Criminal Procedure to grant adequate remedies for alleged discovery violations by the government; (5) that the government failed to provide timely notice under Federal Rule of Evidence 902(11) of its intent to offer certain records into evidence; (6) that the evidence at trial was insufficient to support a conviction; and (7) that the district court erred in sentencing Jordan on Count 1 in finding the amount of intended loss from Jordan's actions to be around $811,000.  For the reasons explained below, we **AFFIRM** Jordan's conviction and sentence.

## I.  BACKGROUND

### A.  Factual Background

On July 13, 2006, Norma Browne, senior corporate-security investigator for AmerenUE, a gas and electric utility based in St. Louis, discovered that someone had sent commercial customers an unauthorized flyer containing AmerenUE's corporate logo directing them to begin mailing their payments to a new address.  Joint Appendix ("J.A.") at 130-33 (Trial Tr. at 81-84).  The flyer told customers to send payments to a post-office box with a Nashville zip code, and referred customers with questions to a telephone number with a St. Louis area code.  J.A. at 90 (Ex. 1).  Browne was put in contact with United States Postal Service ("USPS") Inspector William Dorroh in Nashville, who immediately began an investigation.  J.A. at 133 (Trial Tr. at 84); J.A. at 206-07 (Trial Tr. at 239-40).

Dorroh soon learned that the Nashville zip code on the flyer was controlled by Suntrust Bank ("Suntrust").  J.A. at 207-08 (Trial Tr. at 240-41).  Suntrust had assigned the post-office-box number listed on the flyer, P.O. Box 440474, to a specific "lock box" account.  J.A. at 135-37 (Trial Tr. at 100-02).  A "lock box" is a system whereby a bank controls an entire zip code and assigns to individual customers post-office-box numbers within that zip code; as checks are received at the local post-office-box address, the bank automatically deposits them into the customer's account.  On July 13, Dorroh met with Suntrust fraud investigator, Jim Dixon, who told Dorroh that the account had been opened in the name of "Gerald Hurt," doing business as "Ameren UE Billing Company," with a mailing address in Brentwood, Tennessee.  J.A. at 137 (Trial Tr. at 102); J.A. at 208 (Trial Tr. at 241).  Dixon told Dorroh that bank records indicated that a debit card for the account had already been mailed to the Brentwood address.  J.A. at 208 (Trial Tr. at 241).  The account had been initially funded with a $50 money order, a copy of which was obtained by Dorroh, along with the corresponding deposit slip for $50.  J.A. at 209-10 (Trial Tr. at 242-43); J.A. at 222-23 (Trial Tr. at 255-56).

On July 14, 2006, Dorroh followed up at the address in Brentwood, discovering that it was a virtual office, or commercial mail receiving agency ("CMRA"), called Office Suites PLUS.  J.A.

---

**2** Section 1028A(a)(1) provides that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1).  Subsection (c) includes mail, bank, and wire fraud among the enumerated offenses.  *Id.* § 1028A(c)(5).

at 212-13 (Trial Tr. at 245-46).[3] There, Dorroh met with the manager of the facility, Sara Bottoms, who gave Dorroh a copy of the CMRA application that was used to open the account in question. J.A. at 214-15 (Trial Tr. at 247-48). Dorroh testified at trial that his review of this application—a standard USPS form required for such accounts—led him to believe that the account was fraudulent and opened with a fraudulent New York driver's license. *Id.* Bottoms testified at trial that the process of opening the account had been initiated on June 15, 2006, when a man identifying himself as "Gerald Hurt"[4] called Bottoms seeking to open an account on behalf of AmerenUE Billing Company and provided an address in Hendersonville, Tennessee. J.A. 182-84 (Trial Tr. at 180-82).[5] Bottoms informed "Hurt" that before the account could be opened he would have to fill out a license agreement and CMRA application, and following the phone conversation she mailed the forms to the Hendersonville address. J.A. at 183 (Trial Tr. at 181). Bottoms also testified that on June 23, 2006, a man identifying himself as "Thomas Gordon" came into the office of Office Suites PLUS to make an initial payment of $248, via money order, to open this account. J.A. 192-93 (Trial Tr. at 190-91). At trial, Bottoms identified this man as Defendant-Appellant Jordan. J.A. at 194 (Trial Tr. at 192).

During Dorroh's meeting with Bottoms at Office Suites PLUS on July 14, Dorroh began inspecting the mail being held for AmerenUE Billing Company. J.A. at 215-16 (Trial Tr. at 248-49). He suspected that one letter contained the debit card that Suntrust Bank had sent to the Office Suites PLUS address, because, as he testified at trial, he "could feel the debit card in there." J.A. at 216 (Trial Tr. at 249). Dorroh testified that he then left Office Suites PLUS "for a short period of time in order to acquire assistance from fellow law enforcement agents." J.A. at 218 (Trial Tr. at 251). He soon returned to Office Suites PLUS, "sat down in the lobby and pretended to be a customer." *Id.* Dorroh testified that he then observed Jordan enter Office Suites PLUS, holding a check in an awkward manner, which Dorroh believed was intended to prevent leaving fingerprints on the check. J.A. at 218-19 (Trial Tr. at 251-52). Dorroh further testified that Jordan approached the receptionist and said, "I am here to pay for the Ameren account." J.A. at 219 (Trial Tr. at 252). After seeing Bottoms take Jordan back to her office, Dorroh then exited the building and waited outside. *Id.* Bottoms testified that Jordan—again identifying himself as "Thomas Gordon"—made a payment of $102 then left the office. J.A. at 200-01 (Trial Tr. at 198-99).

As Dorroh and his supervisor observed Jordan exiting Office Suites PLUS with a bundle of mail and get into his car, they decided to arrest him. J.A. at 220 (Trial Tr. at 253). Dorroh testified that as he approached the vehicle, he saw that Jordan had already opened the envelope that Dorrow suspected contained the Suntrust debit card and that Jordan was looking at the debit card. *Id.*

Jordan was arrested by Dorroh on July 14, 2006, and then held by state authorities until being arrested on a federal complaint on July 18. J.A. at 41 (Arrest Warrant).

---

[3] CMRAs, such as Mailboxes, Etc. and UPS Stores, offer various advanced mailing services, including receiving all of a customer's mail, signing for packages, accepting faxes, and providing other business services for a fee. J.A. at 212-13 (Trial Tr. at 245-46).

[4] The victim of identity theft in this case, the real Gerald Hurt, is a resident of New Jersey, who testified that he had no dealings with Office Suites PLUS or AmerenUE, and no knowledge of the unauthorized use of his name, date of birth, and social security number until being contacted by authorities. J.A. at 277-91 (Trial Tr. at 344-58).

[5] Inspector Dorroh later discovered that the Hendersonville address was another CMRA facility, Pony Mail Services. J.A. at 233 (Trial Tr. at 266).

## B. Procedural Background

On July 18, 2006, the district court appointed counsel from the Federal Public Defender's Office to represent Jordan. J.A. at 40 (Appointment of Federal Public Defender). On July 20, a magistrate judge held a probable cause and detention hearing and ordered Jordan detained pending trial. J.A. at 43-46 (Order of Detention). Upon appeal of the magistrate judge's detention order, on August 30, 2006 the district court ordered Jordan to remain detained because he posed a risk of flight and a danger to the community. J.A. at 48-49 (Appeal of Detention Order); J.A. 54 (Order).

On August 9, 2006, the government filed a motion for leave to file a sealed document. J.A. at 47. That same day the government filed a sealed *ex parte* motion requesting a thirty-day extension of time in which to indict Jordan pursuant to 18 U.S.C. § 3161(h)(8)(A) of the Speedy Trial Act. J.A. 347-51 (*Ex Parte* Motion). The district court granted that motion in a sealed order on August 14, 2006, giving the government until September 15, 2006, to file an indictment. J.A. at 352 (Sealed Order).

On September 12, 2006, Jordan filed a *pro se* motion for "Failure to Indict" requesting release from custody because the government had failed to file an indictment as of September 7, 2006. J.A. at 56 (Motion for Failure to Indict #1). That motion was denied by the district court on September 18, 2006. J.A. at 60 (Order).

On September 13, 2006, a grand jury indicted Jordan for one count of mail fraud in violation of 18 U.S.C. § 1341. J.A. at 23-27 (Indictment). Also on September 13, Jordan filed a motion to have his appointed counsel dismissed from the case. J.A. at 58-59 (Motion to Dismiss Federal Public Defender). After a hearing on September 18, the district judge permitted Jordan's initial counsel, Douglas Thoresen, to withdraw, J.A. at 60 (Order), and appointed Michael Flanagan to represent Jordan on September 19, J.A. at 64. On September 20, Jordan filed a second *pro se* motion for "Failure to Indict" requesting release from custody because the government had not indicted Jordan as of September 14, 2006. J.A. at 62 (Motion for Failure to Indict #2). The district court denied this motion on September 21. J.A. at 65.

Though then represented by Flanagan, on September 27, 2006, Jordan filed a *pro se* motion for a speedy trial, J.A. at 66 (Motion). This motion was granted by the district court on October 3, J.A. at 67, and Jordan's trial date was set for November 28, 2006, J.A. at 68-69 (Order). On October 25, 2006, a grand jury charged Jordan in a superseding indictment with one count of mail fraud in violation of 18 U.S.C. § 1341 and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). J.A. at 28-31 (Superseding Indictment).

Less than two weeks before trial, on November 16, 2006, Jordan filed a letter with the district judge requesting removal of his appointed counsel, Michael Flanagan, and requesting appointment of standby counsel to aid his *pro se* defense. J.A. at 77 (Letter). After a hearing on November 20, 2006, the district court granted Jordan's request to relieve Flanagan from the case, but found that Jordan had elected to forego the appointment of standby counsel by insisting on proceeding to trial on November 28. J.A. at 83 (Order).

The trial took place on November 28-30, 2006. At trial, the government introduced numerous pieces of evidence recovered from Jordan's car that connected him to the Suntrust lock-box account and to the fraudulent flyer directing Ameren customers to send payments to the Suntrust account. Linking Jordan to the Suntrust account were the following: (1) the SunTrust debit card in the name of "Gerald Hurt," which Dorroh testified Jordan was holding in his hand when he approached Jordan's car, J.A. at 220-21 (Trial Tr. 253-54); (2) the receipt from the $50 money order that initially funded the Suntrust account, J.A. at 222-23 (Trial Tr. at 255-56); (3) printed-out Yahoo driving directions from Lawrenceville, Georgia, where the Suntrust account was initially funded,

to the Office Suites PLUS address in Brentwood, Tennessee, J.A. at 224-25 (Trial Tr. at 257-58); (4) printed-out Yahoo driving directions from Office Suites PLUS in Brentwood to the Hendersonville, Tennessee address of Pony Mail Service, which was the address given for AmerenUE Billing Company on the Office Suites PLUS application, J.A. at 225 (Trial Tr. at 258); J.A. at 233 (Trial, Tr. at 266).

The government also introduced substantial evidence linking Jordan to the fraudulent flyer, including the following: (1) a T-Mobile cell phone found in Jordan's car that, when called, played a recorded message and automated options purporting to be AmerenUE customer service, and was reached by callers of the phone number on the fraudulent flyer, J.A. at 226-28 (Trial Tr. at 259-61); (2) records from T-Mobile showing that the cell phone had been obtained by "Gerald Hurt," with the address of Pony Mail Services, the CMRA in Hendersonville, J.A. at 232-33 (Trial Tr. at 265-66); (3) records from T-Mobile showing that the cell phone had been used to call Office Suites PLUS on the morning of July 14, J.A. at 233 (Trial Tr. at 266), when Sarah Bottoms testified that she had received a phone call from "Gerald Hurt," J.A. at 199 (Trial Tr. at 197); (4) a gift card recovered from Jordan that was used to pay for a Skype telephone number in June and July of 2006, J.A. at 243-46 (Trial Tr. at 276-79); (5) records from Skype showing that this gift card, in the name of "Gerald Hurt," was used to pay for Skype service providing the telephone number used on the fraudulent flyer, J.A. at 248-52 (Trial Tr. at 281-85); (6) Skype records showing that calls to this Skype number (the one on the flyer) were automatically forwarded to the T-Mobile telephone found in Jordan's car containing the automated recording and options purporting to be AmerenUE customer service, J.A. at 250 (Trial Tr. at 283).

Following trial, on November 30, 2006, a jury convicted Jordan on both Counts 1 and 2. J.A. at 91 (Verdict). After finding the intended loss to be around $811,000, the district court determined the guideline range for Count 1 to be 87-108 months. J.A. 341-42 (Sentencing Tr. at 101-02). The district court, however, granted a downward variance and sentenced Jordan to only 48 months on Count 1, to run consecutively with a mandatory sentence of 24 months on Count 2. J.A. at 343 (Sentencing Tr. at 111); J.A. at 33-34 (Judgment). Jordan filed a timely notice of appeal.

## II. ANALYSIS

### A. Speedy Trial Act

We review de novo a district court's legal interpretation of the Speedy Trial Act, 18 U.S.C. § 3161, and review for clear error the factual findings supporting a district court's ruling. *United States v. DeJohn*, 368 F.3d 533, 538 (6th Cir.), *cert. denied*, 543 U.S. 988 (2004).

The Speedy Trial Act ("Act") provides that "[a]ny . . . indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). But the Act also contains various statutory exclusions under which certain periods of delay are not counted toward the speedy-trial clock. *See* § 3161(h). As relevant here, the Act excludes from the thirty-day clock "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to" several enumerated types of delays, § 3161(h)(1), including "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion," § 3161(h)(1)(F). The Act also provides for a so-called "ends-of-justice" continuance. *See* § 3161(h)(8)(A). This provision permits a district court to grant a continuance that excludes from the speedy-trial clock the resulting delay when the court makes "findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," and "sets forth, in the record of the case, either orally or in writing, its reasons" for these findings. § 3161(h)(8)(A). These findings "must be put

on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." *Zedner v. United States*, 547 U.S. 489, 507 (2006).

Jordan argues that he was entitled to dismissal of the charges against him because more than thirty *countable* days elapsed between Jordan's initial arrest on July 14, 2006, and his indictment on September 13, 2006. Jordan concedes that the following periods are properly excluded from the speedy-trial clock: July 18 (initial appearance); July 20 (preliminary hearing); August 10-14 (pendency of government motion). However, Jordan disputes the most important exclusion claimed by the government—a thirty-day ends-of-justice continuance granted by the district court under § 3161(h)(8)(A) on August 14. If this continuance was properly granted by the district court, less than thirty days elapsed on the speedy-trial clock, and there was no violation of the Speedy Trial Act. If it was not properly granted, more than thirty days elapsed, and therefore Jordan was entitled to dismissal of the charges against him.

The ends-of-justice continuance at issue was granted by a magistrate judge in a sealed order on August 14, giving the government until September 15 to indict Jordan. J.A. at 352 (Sealed Order). On August 9, the government filed a motion requesting leave to file a sealed document. J.A. at 47. Leave was evidently granted, because also on August 9 the government filed a sealed *ex parte* motion requesting a thirty-day continuance under § 3161(h)(8)(A). J.A. at 347-51 (*Ex Parte* Motion).[6] In support of the continuance, the government cited the complexity of Jordan's scheme, outstanding grand jury subpoenas to banks and telephone companies, and the possibility that Jordan had engaged in similar schemes in South Carolina and Nevada. *Id.* In the sealed order granting the continuance, the magistrate judge made the following findings:

> The Court finds that the ends of justice served by the extension outweigh the best interests of the public and the defendant in a speedy trial in that: 1) The failure to grant such an extension would result in a miscarriage of justice; and 2) The arrest in this case precedes indictment, and the facts upon which the grand jury must base its determination are unusual or complex; and 3) The failure to grant such an extension would deny the attorney for the government reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

J.A. at 352 (Sealed Order).

When a district court grants such an ends-of-justice continuance, it must "set[] forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). We conclude that the district court met these requirements of § 3161(h)(8)(A) in granting the continuance. First, the magistrate judge tracked the language of the statute in the sealed order, indicating that he was aware of the statutory requirements. *See* § 3161(h)(8)(B) (listing factors "which a judge shall consider in determining whether to grant a continuance under [§ 3161(h)(8)(A)]"). Second, sufficient facts to satisfy those requirements were set forth in the government's *ex parte* motion, including the fact that a grand jury investigation into Jordan's activities was ongoing and that the grand jury was awaiting returns on subpoenas from various banks and telephone companies.

Nonetheless, we must also address a serious procedural issue raised by Jordan's counsel for the first time at oral argument. There, Jordan's appellate counsel asserted that neither he nor Jordan had previously been notified of the ends-of-justice continuance granted by the district court on

---

[6] According to the attached Certificate of Service, the motion was not served upon Jordan's then-counsel, Assistant Federal Public Defender Douglas Thoresen, because it contained matters relating to grand jury proceedings required to be kept secret under Rule 6 of the Federal Rules of Criminal Procedure.

August 14. According to Jordan's current counsel—who began representing Jordan after conviction but before sentencing—he first became aware of the continuance upon receiving the government's appellate brief in this case. Indeed, nothing in the record before us demonstrates that either Jordan or his current or former counsel were furnished, prior to this appeal, with the government's *ex parte* motion for a continuance or the sealed order of the district court granting that motion. When pressed on this issue at oral argument, the Assistant U.S. Attorney ("AUSA") recalled discussing the continuance with Jordan's counsel at the time. But the record before us contains nothing that would indicate the existence or content of any communication regarding the continuance.

We begin by noting that "*ex parte* actions under [§ 3161](h)(8)(A) are red flag signals to an appellate court." *United States v. Mitchell*, 723 F.2d 1040, 1044 (1st Cir. 1983), *abrogated on other grounds by Henderson v. United States*, 476 U.S. 321, 325-27 (1986). Although there is nothing in § 3161(h)(8)(A) specifically requiring a district court to hold a hearing before granting a continuance, we caution that *ex parte* action should be the exception rather than the rule. *See Mitchell*, 723 F.2d at 1044. As a general matter, *ex parte* contacts between a party and the trial court in criminal trials "are nearly always problematic in light of the Sixth Amendment's guarantee of a public trial." *United States v. Madori*, 419 F.3d 159, 171 (2d Cir. 2005). These concerns are heightened in the context of a motion for a continuance under § 3161(h)(8). As the Supreme Court has explained, "[t]he strategy of § 3161(h)(8) . . . is to counteract substantive openendedness with *procedural strictness*." *Zedner*, 547 U.S. at 509 (emphasis added). To this end, the district court must make on-the-record findings explaining the reasons for granting an ends-of-justice continuance. *Id.* at 506-09. We believe that in order to assure that the district court adequately considers whether the ends-of-justice outweigh the public's and defendant's interests in a speedy trial, the district court should also generally hold an adversarial hearing in which both sides participate.[7] Without the participation of the defendant, the district court is less likely to give full and adequate consideration to the defendant's countervailing interests in a speedy trial.

Furthermore, we take exception to the undue secrecy here surrounding the government's *ex parte* motion and the district court's order granting the continuance. Both documents were entered under seal. It is unclear on the record before us when, or even if, they were unsealed and provided to Jordan or Jordan's counsel in the court below. As noted previously, Jordan's counsel complained at oral argument that he was not aware that a continuance had even been granted until he received the government's appellate brief.

The government's stated reason for filing its motion for a continuance under seal—and without serving Jordan's counsel—was to protect the secrecy of the grand jury proceedings pursuant to Rule 6 of the Federal Rules of Criminal Procedure. J.A. at 348-51. The magistrate judge, meanwhile, offered no explanation for sealing the August 14 order granting the ends-of-justice continuance. We believe that the level of secrecy exercised here by both the government and the district court was unjustified. We acknowledge that the government may, in the proper case, justifiably keep secret the details of a grand jury investigation in a motion for a § 3161(h)(8)(A) continuance. Here, however, the only arguably revealing details contained in the government's sealed motion were that the grand jury had outstanding subpoenas for the records of "banks and telephone companies," and that investigators were looking into whether Jordan was "involved in similar utility fraud schemes in both South Carolina and Nevada." J.A. at 349. These facts could easily have been redacted so that the motion revealed nothing beyond the mere existence of a grand jury investigation.

---

[7] Of course, when the nonmoving party has notice of the motion and the motion is uncontested, the district court need not hold a hearing.

The sealing of the magistrate judge's order was even less necessary. Federal Rule of Criminal Procedure 6(e)(6) requires that "[r]ecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6). But the magistrate judge's order merely recited the statutory factors in the course of finding that the ends of justice outweighed the public's and defendant's interests in a speedy trial. Nothing in the sealed order related to secret grand-jury matters. Consequently, the district court should not have sealed this order and should have immediately provided the order to Jordan or his counsel.

Notwithstanding our concerns that the continuance was granted *ex parte* and surrounded by unnecessary secrecy, we conclude that the ends-of-justice continuance was effective to stop the speedy-trial clock. The district court's order met the requirement of § 3161(h)(8)(A) that the court make on-the-record findings that the ends of justice outweigh the public's and defendant's interests in a speedy trial. Further, by tracking the language of the statutory factors, *see* § 3161(h)(8)(B), the magistrate judge signaled that he considered the proper requirements for granting a continuance. Finally, we cannot say that the court clearly erred in finding that the facts set forth in the government's motion—including outstanding subpoenas to banks and telephone companies—were sufficient to meet those requirements.

Because the ends-of-justice continuance granted by the district court did not violate Jordan's rights under the Speedy Trial Act, the entire period after entry of the continuance on August 14 is excludable from Jordan's speedy-trial clock. Additionally, Jordan concedes that seven other days are properly excluded from the speedy-trial clock. Excluding those seven days and the entire period following entry of the August 14 ends-of-justice continuance, there were only twenty-five countable days toward a Speedy Trial Act violation.[8] Because the maximum thirty-day delay provided in § 3161(b) was not exceeded, we conclude that there was no violation of the Speedy Trial Act.

## B. Taint of Illegal Seizure

For the first time on appeal, Jordan argues that the evidence seized from his vehicle was obtained incident to an arrest that was without probable cause in violation of the Fourth Amendment. Under Rule 12(e) of the Federal Rules of Criminal Procedure, a party "waives" any pretrial objection or defense that is not raised before the trial court's pretrial-motion deadline. Fed. R. Crim. P. 12(e). Rule 12(e) allows the court to grant relief from waiver for "good cause." *Id.* But this court has held that when a defendant completely fails to file a pretrial motion to suppress evidence, "we are categorically without jurisdiction to hear appeals of suppression issues raised for the first time on appeal." *United States v. Crismon*, 905 F.2d 966, 969 (6th Cir. 1990); *see also United States v. Lopez-Medina*, 461 F.3d 724, 738-39 (6th Cir. 2006).

Here, Jordan not only completely failed to file a pretrial motion to suppress evidence based on his arrest and search, but also affirmatively waived the issue on the record by declining to file a motion to suppress after being urged to do so by former counsel and questioned by the district court about his failure to heed counsel's advice. At the status conference on November 20 at which Jordan obtained the court's permission to represent himself, Michael Flanagan, who had just been relieved from his representation of Jordan, told the court that he was concerned about Jordan's decision not to file a motion to suppress the evidence seized in Jordan's initial arrest. J.A. at 106 (Status Conference Tr. at 13). The district judge confirmed with Jordan that he had discussed the matter with his former counsel and that he had chosen to not file a motion to suppress. J.A. at 106-07 (Status Conference Tr. at 13-14). When asked why he would not file a motion to suppress, Jordan replied, "'It's just time for me to go to trial." J.A. at 107 (Status Conference Tr. at 14). The

---

[8] July 14 through July 17 (4 days) + July 19 (1 day) + July 21 through August 9 (20 days) = 25 days.

judge then asked, "Even though you may have a valid motion to suppress that would suppress evidence that is damaging to you?" Jordan replied, "That's correct." *Id.*

In conclusion, because Jordan refused to file a pretrial motion to suppress, he conclusively waived any challenge on appeal to the evidence seized incident to his arrest.

## C. Denial of Standby Counsel

Jordan argues that the district court erred in refusing to appoint standby counsel to assist him at trial after Jordan obtained removal of his second appointed counsel, Michael Flanagan, eight days before trial. It is undisputed that Jordan knowingly and voluntarily exercised his Sixth Amendment right to represent himself pursuant to *Faretta v. California*, 422 U.S. 806 (1975). After Jordan requested removal of Flanagan on November 16, 2006, the court held a hearing on November 20, 2006 and permitted Jordan to represent himself. J.A. at 104 (Status Conference Tr. at 7). After granting that request, the court informed Jordan that he could choose either to proceed to trial as scheduled eight days later without standby counsel, or alternatively accept a continuance of the trial date to allow standby counsel adequate time to become familiar with the case. *Id.* After explaining the options, the court asked Jordan, "Do you want to postpone the trial and have standby counsel, or do you want to have a trial next Tuesday?" *Id.* Jordan replied, "I would rather have the trial next Tuesday." *Id.*

Clearly, if Jordan had accepted the district court's reasonable offer of a continuance, the court would have appointed standby counsel. We conclude, therefore, that Jordan voluntarily waived any right he might have had to standby counsel by refusing the district court's offer to grant a continuance giving standby counsel adequate time to become familiar with the case.

## D. Discovery Violations under Rule 16

We review a district court's decisions under Rule 16 of the Federal Rules of Criminal Procedure for abuse of discretion. *United States v. Muhammad*, 948 F.2d 1449, 1454-55 (6th Cir. 1991), *cert. denied*, 502 U.S. 1119 (1992). Rule 16 provides that the government, upon request by a defendant, must permit the defendant to inspect and to copy or photograph papers or tangible objects "if the item is within the government's possession, custody, or control" and is "material to preparing the defense," intended for use in the government's case in chief, or "was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). If the district court finds that a violation of Rule 16 has occurred, it has discretion to impose a number of sanctions, including ordering discovery, granting a continuance, excluding the undisclosed evidence, or granting "any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2).

Jordan argues that the district court erred in not granting, *sua sponte*, a continuance of the trial date upon learning at the pretrial conference on November 27 that Jordan had not been provided with certain documents that the government intended to introduce into evidence. At the pretrial conference on November 27, Jordan asserted that he had not been provided copies of phone and debit card records that the government intended to introduce as business records. J.A. at 109-11 (Pretrial Conference Tr. at 11-13). But the court found that these documents had previously been made available to Jordan's former counsel, Michael Flanagan, in a timely manner, and that only the certifications attached thereto were newly produced. J.A. at 110-13 (Pretrial Conference Tr. at 12-15). Flanagan apparently did not make copies of these documents, and therefore the packet that he provided to Jordan did not contain them. *Id.* The court offered Jordan a continuance to give him time to review the documents, but Jordan refused and decided to proceed to trial the next day. J.A. at 113-14 (Pretrial Conference Tr. at 15-16). Later in the hearing, Jordan asked for a continuance, but when told that this would entail delay of his trial, Jordan again chose to proceed to trial the next day. J.A. at 116-17 (Pretrial Conference Tr. at 18-19).

Jordan now complains on appeal that the district court erred in forcing him to choose between either accepting a continuance or proceeding promptly to trial. Specifically, Jordan argues that the district court improperly sought to force him to "sign a speedy trial waiver" before it would grant a continuance. Jordan Br. at 38. But the district court here sought no such "waiver."[9] Instead, it merely sought to accommodate a *pro se* defendant on the eve of trial by offering him a continuance that would have given him more time to familiarize himself with the government's evidence. Consistent with Rule 16, the district court offered—and Jordan refused—a remedy that was "just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D).

Jordan also argues that the district court erred in admitting into evidence several documents that Jordan claims the government failed timely to provide during discovery. Specifically, Jordan asserts that he did not receive seven documents prior to trial—Exhibits 7, 8, 9, 10, 11, 13, and 29—and that the district court failed to fashion appropriate relief pursuant to Rule 16. The government responds, first, that there was no Rule 16 violation because all of these documents were promptly provided to either Jordan or Jordan's former counsel, Flanagan, who had the opportunity to photocopy any documents he thought necessary. In the alternative, the government argues that, even if there were discovery violations for late-provided documents, the district judge fashioned appropriate remedies pursuant to Rule 16(d)(2), including offering Jordan continuances and ordering prompt provision of documents to Jordan.

First, there is no indication in the record that the district court admitted into evidence any document that was not promptly disclosed to either Jordan or his former counsel. Before the jury was brought in on the second day of trial, the court reviewed each of the seven documents that Jordan had not previously received. The district court excluded Exhibit 7 and a portion of Exhibit 8 that had been provided late. J.A. 162-64 (Trial Tr. at 130-132). The government never offered Exhibit 11 into evidence. The court found that Exhibit 13—a check from "Ameren UE Billing" for the virtual office at Office Suites PLUS—had been provided to former counsel Flanagan well in advance of trial. J.A. at 171 (Trial Tr. at 139). With respect to both Exhibit 9 (an email from "Gerald Hurt" to Sarah Bottoms of Office Suites PLUS) and Exhibit 29 (another fraudulent flyer, sent to a BMW dealership), the court accepted the government's explanations as to why the documents had been obtained late by the government and therefore provided late to Jordan. J.A. at 164-71 (Trial Tr. at 132-39). Finally, Inspector Dorroh testified that he had previously provided a copy of Exhibit 10 (a money order used to pay the original fees at Office Suites PLUS) to Jordan's former counsel Flanagan. J.A. at 167-69 (Trial Tr. at 135-37).

Even assuming that one or more of these documents were not timely disclosed to Jordan, the district court repeatedly sought to accommodate Jordan using the discretionary relief authorized by Rule 16(d)(2), including offering continuances, granting an early recess on the first day of trial, and ordering the government to provide additional photocopies to Jordan of documents that he did not have. As discussed above, at the pretrial conference on November 27 when Jordan informed the court that certain documents had not been disclosed, the court offered Jordan a continuance to give him time to review the documents, which Jordan refused. J.A. at 113-14 (Pretrial Conference Tr. at 15-16). On the first day of trial before the jury was empaneled, the court again offered Jordan a continuance to review the government's documents, which Jordan again refused. J.A. 121-22 (Trial Tr. at 5-6). Later in the first day of trial, after Jordan asserted that he had not received several documents, the district judge ordered the government to provide Jordan with marked copies of every document it intended to introduce, J.A. at 144 (Trial Tr. at 109), and then ordered an early recess to give Jordan additional time to review the documents, J.A. at 149-53 (Trial Tr. at 114-19).

---

[9] In any case, such a waiver would have had no effect for purposes of the Speedy Trial Act. *See Zedner*, 547 U.S. at 503 (holding that "a defendant may not prospectively waive the application of the [Speedy Trial] Act").

In sum, even assuming *arguendo* that there were discovery violations, the district court did not abuse its discretion in fashioning relief under Rule 16 for any violations that may have occurred.

## E.  Notice under Federal Rule of Evidence 902(11)

Jordan argues that the government failed to provide timely notice under Federal Rule of Evidence 902(11) of its intent to offer T-Mobile phone records corresponding to the phone found in Jordan's car.  Rule 902(11) provides that a party seeking to introduce a business record into evidence:

> must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

Fed. R. Evid. 902(11).

On the first day of trial, Jordan objected that he had received a notice of the government's intention with respect to T-Mobile records for the number "(615) 692-1988," but had received no records for that number and instead had received records for "(615) 397-2323."  J.A. at 122 (Trial Tr. at 6).  The district court concluded that this was due to a typographical error in the notice provided to Jordan and ordered the government to file a corrected notice with the proper phone number.  J.A. at 123 (Trial Tr. at 8).  On the second day of trial, Jordan objected that he had not yet received the corrected notice.  J.A. at 174 (Trial Tr. at 142).  The AUSA explained that he had filed the corrected notice after trial was recessed on the first day, but had no way of serving Jordan electronically in jail.  J.A. at 175 (Trial Tr. at 143).  The court then admonished the AUSA, "Well, then you serve him the minute you see him . . . you don't wait for the court to instruct you to serve him with something that you filed in the case."  J.A. at 175 (Trial Tr. at 143).

We believe that the district court did not abuse its discretion in dealing with this matter.  When first informed of the error, the court ordered the government to submit a correction.  And when the government delayed in serving Jordan, the court warned the government promptly to serve Jordan in person with any filings in the case.  Moreover, even assuming *arguendo* that the district court erred, there is no evidence that Jordan was prejudiced by the delay in being served with the notice, and consequently any error was harmless under Federal Rule of Criminal Procedure 52(a).

## F.  Sufficiency of the Evidence

When reviewing a claim of insufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In this context, "we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir.) (internal quotation marks omitted), *cert. denied*, 534 U.S. 936 (2001).  "The government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt." *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir.), *cert. denied*, 516 U.S. 926 (1995).

"This Court will not consider challenges to the sufficiency of the evidence if the defendant failed to make a Rule 29 motion for judgment of acquittal at the end of the prosecution's case-in-chief and at the close of the evidence.  Failure to make the required motions constitutes a waiver of objections to the sufficiency of the evidence." *United States v. Chance*, 306 F.3d 356, 368-69 (6th Cir. 2002) (citation omitted).  If a defendant fails to make the requisite Rule 29 motions, our review is "limited to determining whether there was a manifest miscarriage of justice.  A

miscarriage of justice exists only if the record is devoid of evidence pointing to guilt." *United States v. Price*, 134 F.3d 340, 350 (6th Cir.) (internal quotation marks and citations omitted), *cert. denied*, 525 U.S. 845 (1998).[10]

Jordan argues that his conviction should be reversed because the evidence introduced at trial was insufficient to establish his guilt beyond a reasonable doubt. However, Jordan made no Rule 29 motion for judgment of acquittal either at the close of the prosecution's case-in-chief or at the close of all the evidence. *See* J.A. at 295 (Trial Tr. at 378); J.A. at 316-17 (Trial Tr. at 424-25). Therefore, our review is limited to determining whether there was a "manifest miscarriage of justice" such that the record is "devoid of evidence pointing to guilt." *Price*, 134 F.3d at 350.

The government presented substantial evidence at trial connecting Jordan both to the Suntrust lock-box account and to the fraudulent flyer directing Ameren customers to send payments to the Suntrust account. This evidence included several items found by Inspector Dorroh on Jordan's person and in his car linking him to the Suntrust account and the flyer. These include the Suntrust debit card linked to the account, the receipt for the money order used to open the Suntrust account, the T-Mobile cell phone containing the fraudulent AmerenUE message, and a gift card used to pay for the Skype telephone number on the fraudulent flyers. Clearly, the record in this case is not "devoid of evidence pointing to guilt." Consequently, we reject Jordan's contention that his conviction was not supported by sufficient evidence.

## G. Sentencing

We review a district court's determination of the amount of loss attributed to a defendant for clear error. *United States v. Tudeme*, 457 F.3d 577, 581 (6th Cir. 2006). We review the sentence imposed for abuse of discretion. *Gall v. U.S.*, --- U.S. ---, 128 S. Ct. 586, 597 (2007).

Jordan argues that the district court erred when it determined the amount of intended loss with respect to Count 1 for purposes of U.S. Sentencing Guidelines § 2B1.1, which addresses offenses involving fraud and deceit.[11] The district court found the intended loss to be around $811,000 (in the Guidelines category of $400,000 to $1 million), adding 14 levels to Jordan's Guidelines level. J.A. at 341-42 (Sentencing Tr. at 101-02). After making this finding, the district court granted a downward variance from the Guidelines range of 87-108 months and imposed a sentence of 48 months on Count 1. J.A. at 343-44 (Sentencing Tr. at 111-12).[12] Jordan nonetheless argues that the district court erred in calculating intended loss under the Guidelines because the

---

[10] In *Price*, the court applied this standard of review where the defendant made a Rule 29 motion at the close of the government's case-in-chief, but failed to renew the motion at the close of all the evidence. *Price*, 134 F.3d at 349-50. We believe that the same standard should apply when, as here, the defendant failed to make a Rule 29 motion at *both* the close of the government's case-in-chief and at the close of all the evidence.

[11] The sentence for Count 2 is not in dispute because it carried a mandatory two-year sentence that must run consecutively.

[12] A sentence outside the Guidelines based on Chapter 5 of the Guidelines is a "departure" or "Guideline departure," whereas a sentence outside the Guidelines based on the § 3553(a) factors is a "variance" or "non-Guideline departure." *See United States v. Cousins*, 469 F.3d 572, 577 (6th Cir. 2006), *overruled in part on other grounds by Irizarry v. U.S.*, 128 S. Ct. 2198 (2008). The district court in this case imposed a variance because it based its sentence on the § 3553(a) factors and did not refer to any of the Chapter 5 bases for departure. J.A. at 354-55 (Statement of Reasons at 2-3).

amount of possible loss was less than $25,000, which would have added only 4 levels to Jordan's Guidelines level. U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G.) § 2B1.1 (2006).[13]

Determination of the offense level under U.S.S.G. § 2B1.1 depends on the amount of loss caused or intended by the defendant. Application Note 3(A)(ii) to this section provides as follows:

> "Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

U.S.S.G. § 2B1.1 cmt. n.3 (2006). In the presentence report, the probation officer estimated the total intended loss at $2,187,532.90, which included the ninety-eight checks actually mailed to the lock-box account *and* the utility bills for customers who received the fictitious flyer but were informed of the scheme before sending payments. J.A. at 365 (Presentence Report at 9). The district court included in its calculation only the ninety-eight checks actually mailed to the lock-box account—totaling around $811,000. J.A. at 341 (Sentencing Tr. at 101).

Jordan argues that because the scheme was discovered and the lock-box account frozen before he could actually withdraw the funds, there was no realistic possibility of a loss of $811,000. He therefore contends that (1) the intended loss was less than $25,000, and (2) a downward adjustment is justified because the scheme had no reasonable possibility of success. In support of these arguments, Jordan cites this court's decision in *United States v. McBride*, 362 F.3d 360 (6th Cir. 2004).

First, the *McBride* court recognized that there is "some point at which a perpetrator's misperception of the facts may become so irrational that the words 'intended loss' can no longer reasonably apply." *Id.* at 374. Jordan's actions clearly do not fall to a level of irrationality; in fact, his scheme was working successfully until discovered by authorities. The intended loss calculated by the district court, around $811,000, was based on checks actually mailed by commercial customers of AmerenUE to the lock-box account as intended under Jordan's scheme.

Second, the *McBride* court recognized that, "[w]here sentencing is based largely or solely on intended loss, a downward departure may be warranted under the 'economic reality' principle." *Id.* at 375. A downward departure to comport with "economic reality" has its basis in Application Note 19(C) to § 2B1.1, which provides: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." U.S.S.G. § 2B1.1 cmt. n.19(C) (2006). Although the current version of the fraud Guideline provides no specific guidance on the application of this downward departure, the former version expressly envisioned a departure based on considerations of economic reality.[14] As one district court has noted, the change to the fraud Guideline "was 'one of style rather than substance.'" *United States v. Roen*, 279 F. Supp. 2d 986, 990 (E.D. Wis. 2003) (quoting ROGER W. HAINES, JR., ET AL., FEDERAL SENTENCING GUIDELINES HANDBOOK 325

---

[13] Although Jordan complains of error by the district court in failing to grant a downward "departure," Jordan's argument actually relates to the district court's calculation of intended loss under the Guidelines and not to any of the Chapter 5 bases for departure.

[14] *See* U.S.S.G. § 2F1.1 cmt. n.8(b) (2000) ("Where the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted."); *id.* § 2F1.1 cmt. n.11 ("In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example, where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it. In such cases, a downward departure may be warranted.").

(2002)).  "The underlying theory behind [the "economic reality"] principle is that where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence based on the intended (but highly improbable) loss determination from the [§ 2B1.1] table." *McBride*, 362 F.3d at 375 (internal quotation marks omitted) (second alteration in original).  One factor considered under the "economic reality" principle is the disparity between the actual loss and the intended loss.  *Id.* at 376.

Unlike *McBride*, where the district court incorrectly believed that it had no authority to impose a sentence outside the guidelines, *see* 362 F.3d at 376-77, in this case the district judge was aware of and actually did grant a downward variance (applying the 18 U.S.C. § 3553(a) factors) from a Guideline range of 87-108 months to an imposed sentence of 48 months for Count 1, J.A. at 343-44 (Sentencing Tr. at 111-12).  Moreover, the "economic reality" principle is not applicable on these facts.  Jordan's scheme was not "obviously doomed to fail," nor were the losses from the scheme "highly improbable."   Rather, the scheme was fully operational at the time it was discovered, having induced AmerenUE's customers to send some $811,000 in payments to the fake address.  And although there was a great discrepancy between the actual losses realized (around $21,500 deposited in the Suntrust account, J.A. at 322-23 (Sentencing Tr. at 18-19)) and the intended losses found by the district court (around $811,000), this is only because the scheme was discovered at an early stage due to the diligence of corporate-fraud investigators and USPS Inspector Dorroh.

The Supreme Court recently set forth instructions for our review of sentencing courts.  *See Gall*, 128 S. Ct. at 597-98.  First, this court must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* at 597.  The district court properly calculated the Guidelines range of 87 to 108 months on Count 1, J.A. at 342 (Sentencing Tr. at 102), considered the § 3553(a) factors, J.A. 353-56 (Sealed Statement of Reasons), and explained in open court the reasons for its downward variance from the Guidelines, J.A. at 343-44 (Sentencing Tr. at 111-12).  In sum, the record shows no procedural error in the district court's sentencing decision.

Second, after determining that the "district court's sentencing decision is procedurally sound," this court "should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 128 S. Ct. at 597.  In conducting this review, this court should "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.*  Where the sentence is outside the Guidelines range, this court "may not apply a presumption of unreasonableness. We may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.*  Because the government does not appeal the district court's downward variance from the Guidelines range, the only issue presented as to substantive reasonableness is Jordan's contention that the district court erred in finding that the intended loss was $811,000, rather than less than $25,000, as claimed by Jordan.  As discussed above, the "economic reality" principle cited by Jordan does not justify a downward revision.  Far from "highly improbable," Jordan's scheme was fully operational and soon would have yielded some $811,000 had authorities not intervened. Accordingly, we conclude that the district court's sentencing decision was substantively reasonable.

In sum, we conclude that the district court did not abuse its discretion in sentencing Jordan to forty-eight months on Count 1.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Jordan's conviction and sentence.