NOT RECOMMENDED FOR PUBLICATION
File Name: 12a1194n.06

No. 11-2368

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Nov 20, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| VIRGINIA DILLARD, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: MOORE, GILMAN, and KETHLEDGE, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Virginia Dillard, who pleaded guilty to a drug-trafficking conspiracy, challenges her 112-month prison sentence. She claims that the district court used a speculative formula to calculate the amount of drugs attributable to her, resulting in an inappropriate offense-level calculation and an excessive term of imprisonment. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

Gwendolyn Washington is a medical doctor previously practicing in Detroit. Virginia Dillard is Dr. Washington's niece and was an employee in her office. Dr. Washington had a general practice, and many of her patients were Medicare beneficiaries. Federal agents, suspecting Dr. Washington of committing healthcare fraud, executed a search warrant at her office in January 2010.

-1-

Medicare then ceased all payments to Dr. Washington for February and March 2010 and, beginning in April 2010, subjected her bills to heightened scrutiny. These changes resulted in a dramatic decline in Medicare payments to Dr. Washington.

To compensate for the medical practice's declining fortunes, Dr. Washington and Dillard hatched a plan to sell prescription drugs on the street. Under this plan, Dr. Washington would write prescriptions—not requested by any patient—for powerful Schedule II painkillers. Dillard would then pick up the painkillers at pharmacies in Detroit and sell them on the street to drug dealers she knew. The scheme worked as planned. Dr. Washington began writing fake prescriptions for OxyContin in February 2010. Around August 2010, when the manufacturer changed OxyContin's formula to curtail its abuse, Dr. Washington switched to prescribing Opana ER, which is like OxyContin but twice as potent. And then, in December 2010, Dr. Washington began prescribing Roxicodone, which works much more quickly than the other two drugs. In making these changes, Dr. Washington apparently took her cues from Dillard, who was familiar with the demand on the street.

At the beginning of the scheme, Dr. Washington attempted to fill OxyContin prescriptions through the mail-order pharmacy MEDCO in addition to using Detroit-area pharmacies. But MEDCO's investigators contacted several of Dr. Washington's patients to verify the prescriptions. The patients told MEDCO that they had never been prescribed OxyContin and had never even heard of the drug.

Suspecting wrongdoing, federal agents initiated surveillance of Dr. Washington in August 2010. The surveillance showed Dillard driving Dr. Washington's car to various pharmacies in Detroit and filling prescriptions for Schedule II painkillers. When picking up the medications,

Dillard would falsely tell the pharmacists that she had patients in the car who were unable to walk in. Later surveillance showed Dillard making the pharmacy trips alone. On one occasion in February 2011, agents saw Dillard drive to a pharmacy, enter the pharmacy, exit with a white bag, drive to a residence, enter the residence, and emerge shortly afterwards without the white bag. Data from the Michigan Automated Prescription System (MAPS) revealed that three prescriptions of Opana ER by Dr. Washington, totaling 180 40-milligram tablets, were filled on that day. The data also revealed that no one at the residence visited by Dillard was prescribed controlled substances at the time.

Agents conducted surveillance on Dillard again in March 2011. They saw that Dillard and another person left the medical office in the morning and drove to Pickens Pharmacy. Dillard entered the pharmacy and exited shortly afterwards with a white bag. She then walked to a nearby liquor store, where she got into a waiting car. The agents followed the car and pulled it over. Dillard was found to have on her person 60 Opana PR pills, 90 Roxicodone pills, and six prescriptions written by Dr. Washington, including two for Roxicodone and two for Xanax.

Two days later, Dr. Washington confessed to participating in a drug-distribution conspiracy with Dillard. Dr. Washington admitted that, starting in February 2010, she would write prescriptions for painkillers and Dillard would fill the prescriptions and sell the drugs. For every OxyContin prescription that Dr. Washington wrote, the doctor would receive approximately $1,000 and Dillard would receive approximately $600.

Dillard confessed to the drug-distribution scheme in an interview with FBI agents later in March 2011. According to Dillard, Dr. Washington "had gone from a rich doctor to a broke doctor" after her difficulties with Medicare billing. She needed money, and she asked Dillard to help sell

prescription narcotics. Dr. Washington knew that Dillard, a former drug addict and drug seller, would know people who were in the market for prescription drugs. Dillard stated that, in one transaction, she sold 90 80-milligram tablets of OxyContin for approximately $2,200, kept $800, and gave $1,400 to Dr. Washington. She also confessed to a similar transaction where she sold Opana ER for $2,000, kept $400, and gave $1,600 to Dr. Washington. Dillard knew that some of the people to whom she was selling drugs would turn around and sell the drugs to other people. She admitted that she would fill prescriptions at least once a week at Pickens and Focus Pharmacies, and that she sold prescription narcotics "roughly two to three times per week."

In her FBI interview, Dillard named several people to whom she had sold drugs and several non-patients who had approached Dr. Washington for painkillers. She also said that Pickens Pharmacy was "crooked" and overbilled insurance companies. But she did not name any participants other than herself and Dr. Washington in the prescription and pickup end of the drug-distribution scheme. Nor did Dillard identify anyone other than herself who made the first sales (as opposed to subsequent resales) of the drugs.

The federal government brought a 31-count indictment against Dillard and Washington in April 2011. Dillard was charged with one count of conspiracy to possess with intent to distribute and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; five counts of possession with intent to distribute controlled substances and aiding and abetting in the same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count of distribution of controlled substances and aiding and abetting in the same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. In July 2011, Dillard pleaded guilty to all the charges pending against her without a plea agreement.

The Probation Department prepared a Presentence Report in September 2011, and the district court held a sentencing hearing in October. Aside from a number of objections to minor factual details that did not affect her sentence, Dillard's only objection to the Presentence Report focused on the amount of drugs attributable to her. The Presentence Report noted that, according to the MAPS data, Dr. Washington prescribed a total of 27,261 pills (the equivalent of 9,236 kilograms of marijuana) during the conspiracy period. Taking Dillard's admission that she would "fill prescriptions at least once per week" and sell the drugs "roughly two to three times per week," the Presentence Report came up with a calculation of 10,097 pills (the equivalent of 3,676 kilograms of marijuana) based on twice-weekly sales and 15,146 pills (the equivalent of 5,514 kilograms of marijuana) based on thrice-weekly sales. The Report concluded that Dillard should be held responsible for a quantity of drugs no less than the equivalent of 3,676 kilograms of marijuana (based on twice-weekly sales) and no more than the equivalent of 9,236 kilograms of marijuana (based on the entire quantity of drugs prescribed by Dr. Washington). Either way, Dillard would have a base offense level of 34 based on the equivalent of at least 3,000 kilograms but less than 10,000 kilograms of marijuana.

Dillard objected that "[t]he formula devised by the Government and adopted by Probation is speculative at best." According to Dillard, there was no evidence that the admission of selling drugs two to three times a week extended over the whole life of the conspiracy. Dillard instead argued that the quantity of drugs attributable to her should be based on the prescriptions that she actually signed for, the prescriptions that were in her name, and the transactions to which she had specifically admitted.

In response, the government pointed out that neither Dillard nor Dr. Washington had identified any other participants in the conspiracy. The government also argued that all the drug activity was reasonably foreseeable to Dillard, who was an admitted participant. In the alternative, the government defended its calculation on the basis of Dillard's own admission and noted that the offense level would be the same whether the calculation is based on sales of twice a week or three times a week.

The district court made the following ruling on Dillard's objection:

[THE COURT:] The Court has before it the issue of the amount of drugs that were involved. The Defendant argues that she was in the conspiracy but that she was not doing the amount that the government contends. The Sixth Circuit requires in a conspiracy case, even though you plead to a conspiracy, that the Court must make a finding with regard to the individual conduct of the specific conspirator. And in terms of breaking it down, the statement of the Defendant with regard to two times a week appears – you don't contest that she made that statement and the statement is before the Court; is that correct?

MR. MAGIDSON [DILLARD'S COUNSEL]: The – we didn't contest that, Your Honor.

THE COURT: Right, right. And it seems, you know, therefore, with regard to the prescriptions written, that the Court will accept that as the guideline. Then the Court will go from that in terms of dealing with the actual sentence. But the guideline range is 135 to 168 based upon the figures provided by the government and based upon the Defendant's statement.

On appeal, Dillard renews her challenge to the calculation of her base offense level of 34. She argues that the calculation accepted by the district court is speculative because it improperly extends the admission of twice-weekly or thrice-weekly sales over the whole life of the conspiracy, even though she never specifically admitted that her sales were consistent throughout the entire period. Dillard instead proposes that the sentence should be based on the prescriptions bearing her

-6-

signature, the prescriptions that were in her name, and the drugs that she has admitted selling, yielding a base offense level of 26 instead of 34.

The government defends the quantity calculation on two independent grounds. First, the government points to well-established law that, "in the case of a jointly undertaken criminal activity," "the defendant is accountable for . . . all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S. Sentencing Guidelines Manual § 1B1.3 cmt. n.2; *accord United States v. Ledezma*, 26 F.3d 636, 646 (6th Cir. 1994). The government argues that Dillard should be held accountable for the full quantity of illegally prescribed drugs because, as a close associate of her aunt, she must have been aware of the full extent of the conspiracy. This theory would render Dillard liable for the equivalent of 7,389 kilograms of marijuana, which is what Dr. Washington has admitted to prescribing illegally. (Dr. Washington admitted that 80 percent of the total pills prescribed by her during the conspiracy—that is, 80 percent of 27,261 pills—were prescribed illegally.) Second, the government contends that the calculation was properly based on Dillard's own admission of selling drugs two to three times per week, which, when combined with MAPS data, would make Dillard responsible for the equivalent of 3,676 kilograms of marijuana (based on twice-weekly sales) or 5,514 kilograms of marijuana (based on thrice-weekly sales). The offense level would be the same (34) under both theories advanced by the government.

## II. ANALYSIS

### A. Standard of review

We must accept a district court's determination of the quantity of drugs attributable to a defendant for sentencing purposes unless that determination was clearly erroneous. *United States*

*v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). "A district court's decision will be found to be clearly erroneous where, having reviewed all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *Id.* at 569.

**B. Discussion**

The government bears the burden of proving by a preponderance of the evidence that a defendant is actually responsible for a quantity of drugs no less than the quantity attributed to her for sentencing purposes. *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990). "If the exact amount cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate." *Id.*

Applying these standards to the present case, we cannot conclude that the district court clearly erred in finding that the government had met its burden of proof in connecting Dillard to the quantity of drugs set forth in the Presentence Report. Dillard confessed in an interview with FBI agents that she sold illegal prescription drugs two or three times a week. She challenges neither the veracity of that confession nor the propriety of considering it for sentencing purposes. Her only objection to the calculation in the Presentence Report is that it extends Dillard's admission of twice- or thrice-weekly sales over the whole life of the conspiracy.

Dillard is correct that she did not specifically state that she sold drugs two or three times a week "during the entire period of the conspiracy." But the implication of duration is fairly warranted in the context of Dillard's March 2011 FBI interview. Dillard does not challenge the accuracy of the interview summary in the record or its consideration for sentencing purposes. In the interview, Dillard talked about the conspiracy as a whole and about what she did during the conspiracy. She did not specifically state that her drug sales occurred over the entirety of the conspiracy, but she did

not cabin her statement to a more limited time period either. Nor has Dillard suggested any reason why the statement should be limited to a shorter period. She has not contended, for example, that she abstained from selling drugs or sold fewer drugs during certain months of the conspiracy. Given the absence of any reason for limiting the time period of Dillard's admission, and given the general context of the interview, construing the admission to cover the whole of the conspiracy was not clearly erroneous.

Moreover, the government's investigation did not indicate that anyone other than Dillard was filling prescriptions and distributing drugs for Dr. Washington. Nor did Dr. Washington or Dillard implicate anyone else in the conspiracy. The only references to other possible participants in the conspiracy appear to be the allusions of Dillard's counsel during the October 2011 sentencing hearing to Dr. Washington's brother, William Washington, and to a certain pharmacist at Pickens who allegedly "had a special relationship with Dr. Washington."

With respect to William Washington, Dillard's only claim is that he drove his sister (Dr. Washington) around on a single occasion. But there was no evidence, nor even an allegation, that he ever filled any prescriptions or sold any drugs. Similarly, there is no evidence or allegation of drug selling with respect to the pharmacist. And the statement of Dillard's counsel that "Dr. Washington was able to use members of her family in ways that were inappropriate, in my view" is too vague to meaningfully suggest that anyone other than Dillard was distributing the drugs. In light of the fact that, by all indications, no one other than Dillard was involved in filling the prescriptions and selling the pills, Dillard could fairly be held accountable for all the prescriptions filled during the conspiracy.

In sum, we hold that attributing Dillard's admission of drug sales to the entirety of the conspiracy was not clearly erroneous. Dillard made her admission in the context of discussing the conspiracy as a whole, she has presented no specific arguments for limiting the time frame of the sales, and she was by all indications the only person who filled the prescriptions and made the initial sale of the drugs.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** judgment of the district court.