NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0601n.06

Nos. 12-1903, 12-2199, 13-1748

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Aug 24, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| LAMONTE WATSON (12-1903); SHAWN | ) | COURT FOR THE EASTERN |
| RENARD SMITH (12-2199); ISAAC DENEL | ) | DISTRICT OF MICHIGAN |
| MEEKS (13-1748), | ) | |
| | ) | |
| Defendants-Appellants. | ) | **OPINION** |
| | ) | |

BEFORE: GUY, GIBBONS, and ROGERS Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. LaMonte Watson, Shawn Smith, and Issac Meeks were each convicted of various crimes related to a conspiracy to distribute cocaine and heroin. They now raise a variety of arguments for reversal of their convictions and sentences. For the reasons that follow, we affirm the district court's judgment in its entirety.

I.

Beginning in 2010, the FBI began wiretapping telephones belonging to Smith and Watson as part of an investigation of a drug conspiracy in Flint, Michigan. They learned that Watson was supplying Smith with heroin and cocaine, which Smith was then re-selling. Smith also made his home available to Watson for the production and sale of drugs.

Investigators also recorded calls between Watson and Meeks. Meeks complained about the quality of a substance he had obtained from another dealer and Watson explained that he was testing the quality of some drugs he had received. Meeks later obtained cocaine and heroin—including some on credit—from Watson and brought him several new customers.

The FBI then executed a number of search warrants for premises involved in the conspiracy. From Watson's home, agents seized over a kilogram of cocaine, two empty, kilogram-sized wrappers containing cocaine residue, a loaded shotgun, and over $100,000 in cash. Smith's house contained some cocaine and heroin, blenders and processors, a cocaine press, two handguns, and a loaded SKS rifle. The officers also searched Meeks's home, where they found over half a kilogram of heroin in separate bags, blenders coated with a powdery residue, cutting agents, an AK-47-style assault rifle, a magazine for the rifle loaded with eighty-eight rounds, more ammunition for the rifle, and a loaded semi-automatic handgun.

Along with nine others, Watson, Smith, and Meeks were indicted for conspiring to distribute over five kilograms of cocaine, one kilogram of heroin, and 280 grams of crack cocaine in violation of 21 U.S.C. § 846. All three defendants were also charged with possession with intent to distribute heroin, being a felon in possession of a firearm, and possession of a firearm in furtherance of a drug trafficking crime. Watson and Smith were charged with possession with intent to distribute cocaine. In addition, Watson alone was charged with manufacture of marijuana and conspiracy to manufacture marijuana.

While awaiting trial, Watson sought dismissal of the indictment against him based on ineffective assistance of counsel. His attorney then moved to withdraw from the case. The district court denied the motion to dismiss but allowed counsel to withdraw and appointed a new lawyer. Watson complained about his new lawyer and sought to replace him, as well.

Eventually, after Watson again complained about his representation mere weeks before trial, the attorney sought to withdraw. Following a hearing, the district court denied the request to withdraw.

All three defendants were tried along with a fourth defendant, Damichael Washington, in October 2011. The court denied Smith's request to give an instruction on multiple conspiracies, holding that the evidence showed only one alleged conspiracy. The court instructed the jury, in the event that it found a defendant guilty of conspiracy under 21 U.S.C. § 846, to then consider the total amount of each drug involved in the conspiracy as a whole. This amount—not just the amount for which each defendant was personally responsible—would then be used for the purposes of sentencing pursuant to 21 U.S.C. § 841(b)(1). During deliberations, the jury requested clarification of the instruction regarding drug quantities. Over the defendants' objections, the court responded that they should find "the amount involved in the conspiracy as a whole . . . regardless of the role that [any given defendant] played." (DE 593, Trial Tr., Page ID 5281.)

Smith and Meeks were both convicted of all counts. Watson was acquitted of possessing a firearm in furtherance of a drug trafficking activity and was convicted of all other charges. The jury found that the quantities involved in the conspiracy were five kilograms or more of cocaine, one kilogram or more of heroin, and 280 grams or more of crack cocaine. Watson was sentenced to life imprisonment. Smith received a total prison sentence of 300 months. Meeks was sentenced to a total of 181 months' imprisonment. All three defendants filed timely notices of appeal.

II.

Watson first argues that the district court's refusal to allow substitution of counsel violated his Sixth Amendment rights. We review such a refusal for abuse of discretion. *United States v. Henderson*, 626 F.3d 326, 340 (6th Cir. 2010). We have previously explained:

> When reviewing a district court's denial of a motion to withdraw or substitute counsel, we generally must consider: (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the matter; (3) the extent of the conflict between the attorney and the client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense; and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001). "'[T]rial judges necessarily require a great deal of latitude in scheduling trials,'" and "'[c]onsequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.'" *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009) (quoting *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983)). As a result, "[w]hen the granting of the defendant's request would almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference." *Id.* at 467 (internal quotation marks omitted).

Watson's motion to substitute his counsel, made nineteen days before trial, was not the first time he complained about his representation. In December 2010, he moved *pro se* to dismiss the indictment based on ineffective assistance of counsel. He followed up with a letter to the district court, referring to his court-appointed attorney as a "dump truck lawyer." (DE 201, Letter, Page ID 791–92.) His court-appointed lawyer then moved to withdraw, explaining, "Defendant clearly does not trust counsel nor counsel's advice [and] [i]it is clear that there is a

breakdown of the attorney-client relationship such that counsel should no longer represent Defendant." (DE 205, Mot. to Withdraw, Page ID 804–05.) The court granted the motion.

The court then appointed a second lawyer, Robert Dunn. Although Dunn filed several motions on Watson's behalf within weeks, Watson again complained about his representation, moving in January 2011 for new counsel and seeking to dismiss the indictment in April 2011 based on Dunn's ineffectiveness. At a hearing in May 2011, Dunn did not object to being replaced but implied that he would be willing to continue representing Watson and stated that he did not hold a grudge. Dunn also discussed some of the particular concerns that Watson had about his work. He explained that Watson would not be entitled to acceptance-of-responsibility credit in the event of a plea because his two prior drug trafficking convictions would give rise to a mandatory life term if convicted in this case. *See* 21 U.S.C. § 841(b). Dunn also explained that he had not carried out Watson's request to move to dismiss the count of using or carrying a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c) because "[t]hat's a question of fact which the jury will decide . . . and I had planned to vigorously contest that." (DE 577, Hr'g Tr., Page ID 3054.) The district court denied Watson's motion, finding: "[T]here has not been any showing that Mr. Watson's current counsel is ineffective. . . . He's argued very vigorously, both in writing and in open court, on behalf of his client. The arguments that Mr. Watson is concerned that his attorney has not been advancing do not appear to be meritorious . . . ." (*Id.* at 3057.) The court denied Watson's subsequent motion to replace Dunn in July 2011.

With the trial scheduled for October 24, 2011, Watson once again moved, on October 4, to replace Dunn. At a hearing, he told the court he "would like to receive a counsel that's gonna be a vigorous advocate for my case and help me fight my case and put in the motions I ask him

to put in and all the arguments that I need to be put in before I go to trial." (DE 581, Hr'g Tr., Page ID 3163.)  Dunn clarified that Watson seemed to have changed his position and decided that "if he can't get other counsel, [he] wishes to represent himself." (*Id.*)  Watson confirmed that he would represent himself "[a]s a last resort." (*Id.* at 3164.)  This time, Dunn requested that he be allowed to withdraw.  He stated:

> This counsel now believes it is absolutely imperative that he be allowed to withdraw to avoid violation of a disciplinary rule.  There is absolutely no trust left in the attorney client relationship, and this counsel has no intention of wasting another long drive to Sanilac County Jail to meet with Defendant when Defendant is only using these meetings to figure out another way to attack this counsel's representation. . . .  It would now be absolutely unreasonable to expect this counsel to continue under the present circumstances and would simply provide Defendant ammunition to attempt to use against him for a grievance, a law suit, or ineffective assistance of counsel.  Further, this counsel will not again speak to the Defendant concerning this case until this motion is filed.

(DE 424, Counsel's Answer, Page ID 1965–66.)  Dunn shed some light on the source of the disagreement, explaining that Watson was asking him to file frivolous motions and "insisting that I bring in a witness that's in fact going to be damaging to him," which Dunn believed "would be the subject later of an ineffective assistance of counsel petition." (DE 581, Hr'g Tr., Page ID 3165–66; *see also id.* at 3169–70.)  He also spoke of the communication issues they were facing: "We can't communicate so I get derisively called names. . . .  I can't talk to this gentleman without knowing that he's going to file some kind of pleading and twist around something that I said.  I cannot represent him without violating a disciplinary rule." (*Id.*)  He added: "I don't think I can communicate with him, I don't think he's going to listen to me.  I don't think he's going to believe anything I say." (*Id.* at 3166.)

Dunn also raised a potential scheduling problem:

> There's another issue that concerns me to some extent in that the Court's decided that the trial would go all day rather than half a day and I teach law four nights a week . . . so [if] we end the Court day at four or 4:30, I'm not going to have time to spend two hours down here trying to explain things to Mr. Watson to his satisfaction . . . .

(*Id.* at 3166.) There was some interrelation between the scheduling issues and Dunn's fears about Watson's motives: Dunn expressed the view that, if he were unable to stay after court to "explain things to Mr. Watson to his satisfaction," this would "just put[] me in the position to get set up to have accusations made against me . . . ." (*Id.*) Dunn suggested that he or another lawyer serve as standby counsel if Watson were left to represent himself, although Dunn noted that "[t]he relationship is so strained I don't know if he would want me to be the standby counsel." (*Id.* at 3168; DE 424, Counsel's Answer, Page ID 1966.) The government stated its strong opposition to any solution that involved severing Watson's trial from that of the other defendants.

The district court decided that Dunn would not be permitted to withdraw. The court found that "the conclusory statement in [Watson's] motion that Mr. Dunn has done nothing or little to prepare for trial simply is not true. . . ." (*Id.* at 3172.) As for the motions that Watson requested Dunn file, the court accepted that they would have been counterproductive or frivolous. The court concluded "that the grounds that have been advanced by Mr. Watson both in writing and also here at the hearing simply have not been substantiated." (*Id.* at 3173.) The district court then considered the impact that a change of lawyers would have on the court's schedule:

> It is simply unworkable to have cases get prepared for trial and then[,] very close to trial, . . . grant a request for a withdrawal from a case or a change of attorneys being requested by a defendant unless there's good cause to allow that withdrawal

or allow for change of attorneys. The Court doesn't find sufficient cause in this case, so it's going to deny Mr. Dunn's request to be allowed to withdraw from the case.

. . .

[T]his case cannot be held hostage simply because a defendant decides that he doesn't want to communicate with his attorney. It appears to the Court that we have a mentally capable defendant and we have an effective attorney ready, willing and able to represent him. That's what due process requires then for a case to proceed. If the defendant chooses not to utilize the defendant's right to have an attorney, that's a choice that the defendant has made and the Court's not going to allow Mr. Dunn to withdraw simply because the defendant is being recalcitrant or is making communication difficult.

With respect to the issue of our trial schedule and Mr. Dunn's other commitments, that's not a matter that's sufficient to allow withdrawal. . . . The Court's willing to consider minimizing the hardship on Mr. Dunn with respect to his teaching responsibilities, but he may have to face the possibility of making other arrangements with his classes during the duration of this trial.

. . .

The Court has set aside this time for [trial] . . . so it has moved a number of cases . . . to make room for trial in this case. In addition, the co-defendants are entitled to a speedy trial and their day in court has been delayed time and time again, of course always with their consent, but it would not be fair to them to delay this case further and it's not fair to the government as well to delay the trial in this matter.

. . .

It's not feasible to sever the case and try Mr. Watson separately from the other defendants. This is a conspiracy case and for all kind[s] of efficiency reasons, it wouldn't make sense to try the case at this point with the relatively smaller number of defendants left in this case in different segments . . . .

(*Id.* at 3174–77.) Dunn reiterated his concern that the breakdown in communication would jeopardize his compliance with his professional duties. After further questioning, the court concluded:

I don't think [there is] a breakdown that's sufficient to cause us to change lawyers. . . . What I see is a defendant who has not been communicating the way a defendant ought to in order to fully utilize his attorney's services and . . . who

claims that his attorney either doesn't know what he's doing or doesn't have the inclination to do what's necessary to represent him . . . . [T]he fact that the defendant has that frame of mind to me is not sufficient to cause me to allow for a change of attorneys [because otherwise] the system would be hostage to the misguided or inaccurate or perhaps even calculating frame of mind of a criminal defendant and we can't have an effective trial system if we're going to have a revolving door that just turns on how much a defendant wants to talk to his lawyer or how much a defendant professes to believe in his lawyer.

(*Id.* at 3178–79.)

The court made clear, however, that Watson had the right to represent himself and that—if Watson wished to do so—the court would have Dunn serve as standby counsel. The court directly asked Watson whether he wanted to represent himself or he wanted Dunn to represent him. Watson chose the latter.

Although there is no indication that Watson and Dunn repaired their relationship, they worked together to some extent at trial. For example, before the jury entered the courtroom, Dunn explained to the court his intention to concede in his opening statement that the cocaine, heroin, and shotgun found in Watson's home were indeed Watson's property. Watson indicated his consent to that strategy. Dunn told the court that "my client and I have had a lot of discussion about whether [the strategy] would be in his best interest." (DE 583, Trial Tr., Page ID 3255.)

Whether or not Dunn's actions were a model of good practices for defense lawyers, for present purposes, we are assessing the actions of the district court, not defense counsel. And under the four-factor test we have articulated, *see Mack*, 258 F.3d at 556, the district court did not abuse its discretion in denying Watson's motion and Dunn's request to withdraw.

A.

The first factor, the timeliness of the motion, weighs against Watson because he filed his motion only nineteen days before trial. We have previously refused to second-guess decisions by district courts to deny requests to change counsel made on a timelier basis than this. The court in *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006), held that there was no abuse of discretion in denying a motion filed "approximately one and a half months prior to the scheduled trial date." A twenty-two day delay was considered "not timely" in *United States v. Fonville*, 422 F. App'x 473, 480 (6th Cir. 2011).

The timing of Watson's motion placed the district court in a difficult position.[1] As the court explained at the hearing on the motion—and as will be discussed under the fourth prong— a substitution of Watson's counsel at that point in time would have caused problems for the court, the government, and Watson's co-defendants. The motion was made just a short time before trial and, as a result, "the trial judge's actions are entitled to extraordinary deference." *Vasquez*, 560 F.3d at 467 (internal quotation marks omitted).

B.

The next factor is the adequacy of the court's inquiry into the breakdown in communication. *Mack*, 258 F.3d at 556. The inquiry was adequate here. After reviewing the motions from Dunn and Watson, the court gave both the opportunity to explain their concerns at a hearing. Watson stated his problems with Dunn. After Dunn explained the source and extent of the communication problems in significant detail, the district court asked follow-up questions and rendered a thorough explanation of its decision to deny the request.

---

[1] Granted, Watson had made other motions to remove Dunn, the first of which was filed ten months before trial. But Watson does not challenge the denial of any other motion on appeal and, in any event, there is no reason to believe that any other denial of a motion to remove Dunn constituted an abuse of discretion.

Watson argues that the district court required too little when it said: "It appears to the Court that we have a mentally capable defendant and we have an effective attorney ready, willing and able to represent him. That's what due process requires then for a case to proceed." (DE 581, Hr'g Tr., Page ID 3172; *see* Watson Br. at 12–13.) This was not a completely accurate statement of the law. Watson's objection was based on his Sixth-Amendment right to counsel and that right—as discussed—contains more than merely a competent defendant and an able, willing lawyer. But Watson is seizing on appeal on an isolated misstatement in the context of a lengthy, detailed explanation that clearly touched on all of the relevant issues and gave a sound reason for the district court's decision. The court spoke of the timing of the motion, the nature and degree of the fracture in Watson and Dunn's relationship, and the impact that a delay would have on other individuals and the system. The explanation was adequate and this weighs in favor of upholding the district court's decision.

## C.

Next, despite Watson's complaints and Dunn's request to withdraw, there was not the kind of "complete breakdown in communication," *Vasquez*, 560 F.3d at 468 (internal quotation marks omitted), that would necessitate substitution of counsel nineteen days before trial. Watson's frustration apparently stemmed, in large part, from Dunn's refusal to take certain actions on his behalf, such as securing the attendance of a particular witness, moving to dismiss the § 924(c) count, and moving for a hearing to determine that one of his prior felonies should not be used as a sentencing enhancement. But Dunn was hardly unresponsive to those requests. As he explained to the district court, he believed that the witness's testimony would have harmed Watson's interests at trial and that the motions would have been frivolous. Dunn claimed, and Watson did not dispute, that the pair had exhaustively discussed those issues. They simply

disagreed on them. The effective counsel that the Sixth Amendment requires need not blindly follow the defendant's every demand. If Dunn had done so in this case, his actions would likely have been strategically and ethically problematic.

Dunn's refusal to take those particular actions did not necessarily signal any lack of competence or effort. As the district court noted, and as the record supports, Dunn appeared to be working hard and acting in Watson's best interests before trial. Given that nineteen days remained between the denial of the motion and the beginning of trial, there was time to continue to build the relationship so as to serve Watson's best interests. This may have occurred to some extent: there is no indication that his performance diminished during trial.

Dunn's request to withdraw certainly required careful scrutiny, especially in light of his concern that the pair could not communicate well enough to uphold Dunn's professional duties. But he appeared to be doing all he could to communicate with Watson. And even with Watson's recalcitrance, there were signs that they were collaborating during trial: Dunn told the court, for example, that he and Watson had engaged in "a lot of discussion" about a strategic issue.

Moreover, as the district court discussed in detail, the cracks in the relationship were attributable—at least to some extent—to Watson's refusal to cooperate with Dunn. In *Vasquez*, the court held that this type of conduct weighed against the defendant on the third factor. 560 F.3d at 468 ("[T]he record reflects that any lack of communication between [the defendant and his lawyer] was likely due to [the defendant's] refusal to cooperate.").

The district court did not abuse its discretion in finding that the relationship was not sufficiently fractured to require the appointment of a new lawyer.

D.

The fourth factor—the public's interest in the prompt and efficient administration of justice—also weighs strongly in favor of the district court's decision to proceed without substituting counsel. The court balanced this public-interest factor, as required, *see Mack*, 258 F.3d at 556, against Watson's interest in having a new attorney appointed.

Given the timing of Watson's motion, the district court would have been left with only two options had it replaced Dunn. First, it could have postponed the entire trial, as it had done several times already. As was clearly articulated on the record, postponement would have burdened the court and the parties due to appear before it in other cases. The government was strongly opposed to any delay. Perhaps most importantly, a continuance would have prejudiced Watson's three co-defendants. All were ready to proceed and had an interest in a speedy trial. Second, the court could have severed Watson's trial from the others. Again, however, there would have been significant costs attached. Given the nature of the case, severance would have required much of the same evidence to be presented a second time. This would have further burdened the court, the government, the witnesses, and a second jury.

As discussed, the other factors do not weigh in favor of requiring substitute counsel. Thus, especially when these are balanced against the substantial costs to the prompt and efficient administration of justice, the district court acted within its discretion in refusing to remove Dunn and appoint new counsel. We affirm that decision.

III.

Meeks challenges the sufficiency of the evidence against him on all counts. We reverse a conviction only if, viewing the facts in the light most favorable to the prosecution, no rational trier of fact could find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319

(1979); *see also United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998) ("[We] draw all available inferences and resolve all issues of credibility in favor of the jury's verdict."). The government's evidence can therefore be entirely circumstantial and "need not exclude every possible hypothesis except that of guilt." *United States v. Jordan*, 544 F.3d 656, 670 (6th Cir. 2008) (internal quotation marks omitted).

On Counts One (conspiracy) and Eleven (possession of a firearm in furtherance of a drug trafficking crime), Meeks moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case. At the end of trial, he moved again—this time as to Count One only—for judgment of acquittal or, in the alternative, a new trial under Rule 33.

Meeks therefore only preserved his sufficiency challenge as to Count One. "'This Court will not consider challenges to the sufficiency of the evidence if the defendant failed to make a Rule 29 motion for judgment of acquittal at the end of the prosecution's case-in-chief *and* at the close of the evidence.'" *United States v. Love*, 553 F. App'x 548, 554 (6th Cir. 2014) (emphasis added) (quoting *United States v. Chance*, 306 F.3d 356, 368 (6th Cir. 2002)). And "'[a]lthough specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived.'" *Id.* at 553 (quoting *Chance*, 306 F.3d at 369). Both of Meeks's Rule 29 motions specifically referred to the counts they were challenging and Count One was the only one that was the subject of a motion both at the end of the prosecution's case-in-chief and the close of all evidence. We therefore review *de novo* the sufficiency of the evidence for Count One. *United States v. Clay*, 667 F.3d 689, 701 (6th Cir. 2012).

Meeks did not properly preserve his sufficiency arguments on the other counts: he did not challenge the sufficiency of the evidence on Counts Nine and Ten at all and he failed to renew his Count Eleven challenge at the close of all evidence. With respect to those counts, therefore, we consider reversing based on the sufficiency of the evidence only if "the record reveals a manifest miscarriage of justice," *United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013) (internal quotation marks omitted), which exists only if "the record is devoid of evidence pointing to guilt," *Jordan*, 544 F.3d at 670 (internal quotation marks omitted).

A reasonable jury could have found beyond a reasonable doubt that Meeks was guilty of Count One—conspiracy to distribute and to possess with the intent to distribute controlled substances, in violation of 21 U.S.C. § 846—beyond a reasonable doubt. To prove a conspiracy in violation of 21 U.S.C. § 846, the government must prove "'(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (quoting *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999)). "A tacit or mutual understanding" to violate the drug laws is sufficient and "[t]he existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* (internal quotation marks omitted). "Once a conspiracy is proven beyond a reasonable doubt . . . a defendant's connection to the conspiracy 'need only be slight,' and a defendant's knowledge of and participation in a conspiracy 'may be inferred from his conduct and established by circumstantial evidence.'" *United States v. Warman*, 578 F.3d 320, 332–33 (6th Cir. 2009) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)).

A rational jury could have concluded that Meeks knew he was part of a joint venture to sell drugs. Meeks concedes that there was a drug conspiracy between Watson and Smith. But he

argues that there was no evidence that he had knowledge of that conspiracy. In Meeks's view, the evidence showed nothing more than a buyer-seller relationship between him and Watson. "In a drug distribution 'chain' conspiracy, it is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *Martinez*, 430 F.3d at 332–33. In one recorded telephone conversation, Meeks explained to Watson: "You really like to know . . . [otherwise] you gotta guess at it an', try that an' try this an' try that. I don't really like doin' that. You know." (DE 693-1, Phone Call Trs., Page ID 11371.) Watson replied: "I should know somethin' later on. . . . I was jus' tryin' to see what it was gonna be . . . , what it was layin' like." (*Id.*) Trial testimony showed that "layin' like" referred to the quality of the substance. (DE 587, Trial Tr., Page ID 4263–64.) When they spoke again on the phone, Watson said that he had "already done got it checked out and everything." (DE 692-2, Phone Call Trs., Page ID 11337.) If this were the only evidence, whether a rational jury could conclude that Meeks knew of the conspiracy would be a close call. From the evidence presented, a rational juror could certainly conclude that Meeks knew Watson had checked the quality of the drugs. Such a juror could also conclude that Watson's method of checking involved other people. And even if this evidence were not sufficient alone, there was other evidence of Meeks's guilt.

The case against Meeks featured three other types of evidence indicative of a conspiracy. First, the sale of "[a] large volume of narcotics creates an inference of a conspiracy." *United States v. Bourjaily*, 781 F.2d 539, 545 (6th Cir. 1986). In *Bourjaily*, the "large volume" at issue was one kilogram of cocaine. *Id.* Here too, Meeks arranged the purchase of a kilogram of cocaine for his nephew, and also sought to purchase heroin. Second, "[e]vidence of repeat

purchases provides evidence of more than a mere buyer-seller relationship." *United States v. Robinson*, 547 F.3d 632, 641 (6th Cir. 2008) (internal quotation marks omitted). In addition to the two purchases just discussed, Meeks ordered additional heroin from Watson three days after the first purchase. Third, "the 'trust involved' in delivering drug quantities on credit 'suggests more than a buyer-seller relationship.'" *Robinson*, 547 F.3d at 641 (quoting *United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir. 1996)). Here, there is evidence that Meeks obtained drugs on credit from Watson. Taking all of these elements together, there was sufficient evidence in the record to find beyond a reasonable doubt that all the elements of 21 U.S.C. § 846 were present and to therefore convict Meeks of Count One.

Next, we must consider whether the record is devoid of evidence pointing toward Meeks's guilt on Counts Nine, Ten, and Eleven. *See Jordan*, 544 F.3d at 670. Count Nine is possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), and Count Ten is felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). To convict Meeks under § 841(a)(1), the government had to prove that he knowingly possessed a measurable amount of heroin with the intent to distribute it. *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991) (per curiam).

A conviction under § 922(g) requires proof that the defendant (1) had a previous felony conviction, (2) knowingly possessed the firearm or ammunition specified in the indictment, and (3) that the firearm or ammunition traveled in or affected interstate commerce. *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007). Meeks contests the sufficiency of the evidence only on the possession element of that crime.

There is evidence in the record pointing to Meeks's guilt of both crimes. The possession element can be satisfied by showing constructive possession. "Constructive possession requires

evidence supporting the conclusion that the defendant had the ability to exercise knowing dominion and control over the items in question." *United States v. Wettstain*, 618 F.3d 577, 586 (6th Cir. 2010) (internal quotation marks omitted). Officers found heroin, an AK-47-style assault rifle, a loaded magazine for that rifle, a loaded semi-automatic handgun, and a revolver in Meeks's bedroom closet. Agents surveilling the address had seen Watson arrive and an individual, then unidentified, approach his vehicle. This occurred after Meeks told Watson to come to his "new crib," believed to be the address under surveillance, to drop off heroin that Meeks had ordered. After the dropoff, Meeks told Watson that he had left his keys in Watson's truck. Inside, officers found evidence of Meeks's control over the home. They discovered pictures of Meeks, along with a letter addressed to Meeks that had been redirected to that address. There was evidence pointing to possession of both the heroin and the firearms, and there was therefore no manifest miscarriage of justice in Meeks's convictions on Counts Nine and Ten.

Count Eleven is possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). "To prove a violation of this section, and specifically the 'in furtherance element,' the government must show 'a specific nexus between the gun and the crime charged.'" *United States v. Brown*, 732 F.3d 569, 576 (6th Cir. 2013) (quoting *United States v. Gill*, 685 F.3d 606, 611 (6th Cir. 2012)). In other words, "the weapon must promote or facilitate the crime." *United States v. Mackey*, 265 F.3d 457, 461 (6th Cir. 2001). The court considers a non-exhaustive list of factors "to help distinguish possession in furtherance of a crime from innocent possession." *Brown*, 732 F.3d at 576. First, "[i]n order for the possession to be in furtherance of a drug trafficking crime, the firearm must be strategically located so that it is quickly and easily available for use." *Mackey*, 265 F.3d at 462. "Other factors that may be

relevant . . . include whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *Id.*

Here, the parties dispute whether the guns were strategically located. The government points out that they were found in the closet along with 535 grams of heroin and items associated with drug dealing, including a digital scale and three coffee grinders. But Meeks refers to *United States v. Leary*, 422 F. App'x 502 (6th Cir. 2011), where the court held that the evidence of the in-furtherance element was insufficient even though the firearm was found in the same closet as the drugs. The court there explained:

> [T]his proximity alone is not enough to establish that the guns were possessed in furtherance of drug trafficking; there must be evidence tending to show a connection between the two. . . . [I]t cannot be true that any time a gun is found near drugs it is necessarily the result of a strategic decision relating to drug activity. Indeed, the guns and the drugs were found in a closet—a storage space, rather than a place from which drugs were sold.

*Id.* at 510–11 (citations and internal quotation marks omitted). The *Leary* court further stated that the government must "show that 'a defendant used the firearm with greater participation in the commission of the crime or that the firearm's presence in the vicinity of the crime was something more than mere chance or coincidence.'" *Id.* at 511 (quoting *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004)). The court distinguished *Leary* in *United States v. Guadarrama*, 591 F. App'x 347, 353 (6th Cir. 2014), where—in contrast to *Leary*—the case "involved a substantial quantity of drugs and drug-paraphernalia located near guns and ammunition in an apartment where drug sales had taken place."

On the first *Mackey* factor, *see* 265 F.3d at 462, the firearms and ammunition were in the same closet as a large volume of heroin—valued at over $50,000—and items commonly used for

dealing drugs. Even if this evidence would not be sufficient for the purposes of *de novo* review—an issue we need not reach—there is certainly a sufficient nexus to provide *some* evidence of guilt and thus negate any notion of a manifest miscarriage of justice. *See Jordan*, 544 F.3d at 670.

This conclusion is further bolstered by the existence of several other *Mackey* factors pointing toward guilt. *See Mackey*, 265 F.3d at 462. Meeks's possession of the firearms was not lawful given his prior felony, hence his conviction on Count Ten. The handgun was loaded. (DE 589, Trial Tr., Page ID 4455.) The AK-47, though unloaded, was close to the magazine that was loaded with eighty-eight rounds of ammunition. (*Id.* at 4454.) This is sufficient evidence for conviction of Count Eleven.

The evidence against Meeks was therefore sufficient on all counts. We affirm.

IV.

All three defendants argue that the district court erred in responding to a question from the jury concerning the determination of drug quantities to be used for sentencing on Count One: conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846.

"This court reviews a district court's actions in responding to questions from the jury for abuse of discretion," and "may reverse a judgment only if the instructions, viewed as a whole, were confusing, misleading and prejudicial." *Robinson*, 547 F.3d at 637 (internal quotation marks omitted). This "'set[s] a high standard for reversal of a conviction on the grounds of improper instructions.'" *Id.* (quoting *United States v. Khalil*, 279 F.3d 358, 367 (6th Cir. 2002)).

"[U]nder § 846, [d]efendants are subject to the same penalties" as a person whose conduct falls within § 841. *United States v. Swiney*, 203 F.3d 397, 401 (6th Cir. 2000). This

subjects a defendant to the mandatory minimum sentences under §§ 841(b)(1)(A) and (B) upon a finding that the violation involved certain specified quantities of drugs. The verdict form was structured accordingly. It first required the jury to determine whether each defendant was guilty or not guilty of Count One. Next, for each guilty defendant, the jury was asked to determine the amount of each drug (cocaine, crack cocaine, and heroin) that was "involved in the conspiracy as a whole." (DE 591, Trial Tr., Page ID 5172–73.) The instructions on Count One included Sixth Circuit Pattern Jury Instruction 14.07B. The jury was instructed:

> If you find by unanimous agreement that the government has proved beyond a reasonable doubt that the conspiracy as a whole involved a quantity of at least five kilograms of a mixture or substance containing a detectible amount of cocaine, one [kilogram] of a mixture or substance containing a detectible amount of heroin or 280 grams or more of a mixture or substance containing cocaine base in the form of crack cocaine, then please indicate this finding on the special verdict form.

(*Id.* 5172.) In the event that the jury did not find this unanimously, it was next instructed to consider the lesser amounts of each drug, as indicated on the special verdict form. The amounts on the special verdict form matched the amounts that trigger 21 U.S.C. § 841(b)(1)(A) and § 841(b)(1)(B) for sentencing purposes. None of the defendants objected to the jury instructions.

> The jury sent out a note during deliberations, which read as follows:

> If we find person A guilty of count one's conspiracy charge, we read that each subsequent question regarding the amount of drugs should represent the amount . . . "involved in the conspiracy as a whole[.]" . . . So if person A was a very minor player, is the amount of drugs for that defendant still the total . . . "involved in the conspiracy as a whole"[?] . . . In other words, should person A and person B have the same amount if both found guilty of the conspiracy charges even if persons A and B were involved with different amounts?

(DE 592, Trial Tr., Page ID 5245.) After hearing arguments from the government and each defendant on the issue, the district court told the jury:

> [T]he answer to your questions for both questions would be yes. It makes no difference whether someone was a minor player, very minor player[,] or major player. If persons are both involved in the conspiracy and you're satisfied the government has proven beyond a reasonable doubt [that] all the requirements for establishing that two people are involved in the conspiracy, it makes no difference whether they are involved in the same amounts or different amounts[.] [W]hat you need to then determine is what is that amount involved in the conspiracy as a whole and then that is the number that you would include for any person regardless of the role that they played; whether you call it very minor, minor or major, it doesn't make a difference. As long as [you] find that they are members of the conspiracy, then all the members of the conspiracy will have the same amount involved in the conspiracy as a whole. Again, you have to determine what that amount is, all right?

(DE 593, Trial Tr., Page ID 5280–81.)

On appeal, each defendant essentially raises the same argument: that the district court misinformed the jury about the law, prejudicing the defendants by creating a likelihood that some or all of them would be held responsible—for the purposes of § 841(b)—for a greater drug quantity than the law requires.

We disagree. The instruction was in line with the applicable Sixth Circuit precedent, namely *United States v. Robinson*, 547 F.3d 632, 637 (6th Cir. 2008). In that case, the jury was asked to determine the amount of cocaine involved in the conspiracy for § 841 purposes. *Id.* at 636. During its deliberations, the jury sent a note asking whether the defendant "must have knowledge of the selling of 5 kilograms of cocaine hydrochloride or if he has to have direct involvement with selling 5 kilograms of cocaine hydrochloride." *Id.* at 637 (internal quotation marks omitted). Over the defendant's objection, the court's answer included the following instruction: "Concerning the drug quantities, you are merely to determine what quantity was involved in the conspiracy the defendant participated in, in the event you find he participated in a conspiracy." *Id.* The jury found the defendant guilty and found that five or more kilograms of

cocaine were involved. *Id.* The district court imposed a life sentence and we affirmed. *Id.* at 640. In so doing, we rejected the defendant's argument "that a drug conspirator is culpable only for quantities personally attributable to him." *Id.* at 638. We held that the district "court's instruction was faithful to the language of 21 U.S.C. § 841(b)(1)(A)," and was "not confusing, misleading[,] and prejudicial." *Id.* at 640 (internal quotation marks omitted).

*Robinson* controls here. The defendants in the present case, like those in *Robinson*, are arguing that the jury's finding of an amount of each drug should be limited to that specific defendant's involvement in the conspiracy. They claim, therefore, that the jury should have been free to find that a particular defendant was responsible for a lesser amount because certain quantities predate his entry into the conspiracy or fall outside the scope of his involvement. *Robinson* squarely rejects this argument. Indeed, *Robinson* was the basis for Sixth Circuit Pattern Jury Instruction 14.07B, which formed the basis of the instruction—including the response to the jury's question—in this case. The commentary on that instruction confirms: "[t]he Sixth Circuit holds that the amount of drugs attributable to an individual defendant for a violation of § 846 is the amount of drugs involved in the conspiracy as a whole, proved beyond a reasonable doubt." Sixth Circuit Pattern Jury Instruction 14.07B, Committee Commentary. And while the defendants correctly argued at trial that the pattern instructions do not themselves have the force of law, this instruction is entirely consistent with *Robinson*.

Between them, the defendants put forward several purported reasons why *Robinson* should not control. They attempt to undermine its precedential value by demonstrating that the decision is inconsistent with Supreme Court case law and with our published decisions issued before *Robinson*. All of these attempts are unavailing.

The defendants first argue, relying on *United States v. Pruitt*, 156 F.3d 638 (6th Cir. 1998), that "no defendant may be held responsible for acts beyond the scope of his or her participation in the conspiracy." *See id.* at 644. But that statement was dicta. As we explained in *Robinson*, the question in *Pruitt* was "whether a conspiracy involving multiple overt acts is nonetheless 'a violation of' [21 U.S.C.] § 841(a)" such that the drug quantities from those multiple acts can be aggregated for sentencing under 21 U.S.C. § 841(b)(1)(A). *Robinson*, 547 F.3d at 638 (alteration in original) (quoting *Pruitt*, 156 F.3d at 644). "The issue was not whether the appellant was culpable for acts of his co-conspirators, and any pronouncements on that topic are dicta." *Id.*

*Pinkerton v. United States*, 328 U.S. 640 (1946), is also inapposite. *Pinkerton* addresses the issue of when a conspirator will be liable for the *substantive offenses* of his co-conspirators. *Id.* at 647–48. But *Pinkerton* does not address whether a defendant already proved guilty of a single substantive offense—conspiracy—can be subject to a mandatory minimum sentence based on the volume of drugs that were involved in that single offense. *See Robinson*, 547 F.3d at 638–39.

*Robinson* is also consistent with *United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000). That opinion—which stated "that *Pinkerton* principles, as articulated in the relevant conduct guideline, U.S.S.G. § 1B1.3(a)(1)(B), determine whether a defendant convicted under 21 U.S.C. § 846 is subject to the penalty set forth in 21 U.S.C. § 841(b)(1)(C)"—concerns sentencing under the Guidelines. *Id.* at 406. A different standard of foreseeability applies in that context to the standard applicable to the drug quantity finding for § 846 purposes, which *Robinson* discusses.

Nor does *Robinson* run afoul of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), or *Alleyne v. United States*, 133 S. Ct. 2151 (2013). As the *Robinson* court noted, *Apprendi* requires only

that the jury "determine that the defendant participated in a conspiracy involving a type and quantity of drugs sufficient to justify a sentence above the default statutory maximum." 547 F.3d at 639 (internal quotation marks omitted). *Alleyne* does not change that conclusion. As this court has already held, *Alleyne* deals with the quantum of proof that applies, not with *mens rea*. *United States v. Dado*, 759 F.3d 550, 569–71 (6th Cir. 2014).

Finally, the defendants are incorrect to claim that *Robinson* is inconsistent with *United States v. Cox*, 565 F.3d 1013 (6th Cir. 2009), a case decided after *Robinson* that relied on *United States v. Jinadu*, 98 F.3d 239 (6th Cir. 1996). (*See* Watson Br. at 17; Smith Br. at 14–15.) *Cox* and *Jinadu* simply held that the court should not rely in sentencing on the amount of drugs charged in the indictment. This says nothing about the present situation.

Applying *Robinson*, the answer is straightforward: the district court correctly instructed that the relevant quantity of drugs is the quantity involved in the overall conspiracy.

V.

We next consider Smith's claim that the district court committed reversible error when it refused to instruct the jury on multiple conspiracies. "This Court reviews a district court's decision not to give a jury instruction for abuse of discretion." *United States v. Triana*, 468 F.3d 308, 315 (6th Cir. 2006). Reversal is warranted if "(1) the proposed instruction is substantially correct; (2) the proposed instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impaired the defendant's theory of the case." *Id.* The instruction should be given even if there is only "weak supporting evidence," *id.* at 316, but "'should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation.'" *Id.* (quoting *United States v. James*, 819 F.2d 674, 675 (6th Cir. 1987)).

Smith requested that the jury be given Sixth Circuit Pattern Jury Instructions 3.08 and 3.09, which address multiple conspiracies. He pointed to evidence of Smith's deals with four other individuals, arguing that each one was potentially a separate conspiracy. The court denied the request, holding that "there isn't any evidence that any of the defendants have been parties to an uncharged conspiracy . . . . The fact that people down the chain may have had other drug transactions and suppliers doesn't mean that the defendants in our case were engaged in an uncharged conspiracy." (DE 591, Trial Tr., Page ID. at 5038–40.)

This court has previously explained:

> [T]he government is not required to prove an actual agreement among the various conspirators in order to establish a single conspiracy. In one form of conspiracy, often described as a "chain" conspiracy, the agreement can be inferred from the interdependent nature of the criminal enterprise. Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often "chain" conspiracies. . . . [A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy.

*United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982) (citations omitted). As a result, "[a] single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis on its locale of operations." *United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) (citation and internal quotation marks omitted). Thus, "it is not easy for a defendant to succeed in making a multiple-conspiracy claim." *Maliszewski*, 161 F.3d at 1014.

The district court did not abuse its discretion in deciding that there was no evidence suggesting that Smith was involved in distinct conspiracies. Even accepting the view of the evidence that Smith advocates, there is no evidence separating his alleged side-deals with other

individuals from the core conspiracy that is the subject of this case. As the district court properly determined, the evidence showed that Watson supplied Smith with drugs and then Smith supplied those to other individuals. This establishes nothing more than a chain conspiracy, which—as discussed—constitutes a single agreement. Smith failed to mention in the district court, and fails to mention on appeal, any evidence that would show distinct conspiracies meriting the requested instruction. All of his arguments simply point to additional individuals who could have been part of the chain. The district court did not abuse its discretion in refusing to give the instruction.

VI.

Meeks challenges the sentence imposed for Count Nine: possession with intent to distribute heroin. The district court applied 21 U.S.C. § 841(b)(1)(B)(i), which establishes a five-year mandatory minimum term when the crime involved "100 grams or more of a mixture or substance containing a detectable amount of heroin," before eventually sentencing Meeks to 121 months on that count. (DE 651, Sentencing Tr., Page ID 8120, 8129.) But the drug quantity for Count Nine was not charged in the information or found by the jury. Meeks therefore claims that the sentence violates his Fifth and Sixth Amendment rights based on *Apprendi* and *Alleyne*. He argues that the district court should have sentenced him under § 841(b)(1)(C), "which establishes the default statutory maximum sentences and does not require as an element of the offense a specific quantity of drugs." *United States v. Stewart*, 306 F.3d 295, 310 (6th Cir. 2002).

Because defense counsel agreed that § 841(b)(1)(B) applied—and did not register an objection to the absence of a jury finding on quantity—the court reviews only for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc).

This court reverses for plain error only if (1) the district court committed an error; (2) that is "plain," and (3) that affects the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). Even then, the court has discretion on whether to reverse, which it "should not exercise . . . unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). Here, the government concedes that the district court committed an error and that the error was plain. The dispute centers on whether the error affected Meeks's substantial rights.

An error in instructing the jury on the elements that will affect a defendant's minimum sentence is not a structural error requiring automatic reversal. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (defining structural errors as "basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determining guilt or innocence" (internal quotation marks omitted)); *United States v. Mack*, 729 F.3d 594, 608 (6th Cir. 2013). The court must therefore ask "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Mack*, 729 F.3d at 607–08 (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)). In other words, the error will not affect a defendant's substantial rights "[i]f it is clear to us beyond a reasonable doubt that the outcome would not have been different even if the district court had instructed the jury on the element . . . and required the jury to make a finding on that element . . . ." *Id.* at 608–09 (upholding the sentence despite the error because a properly instructed jury would have found beyond a reasonable doubt that the defendant committed the conduct that increased the mandatory minimum sentence); *see also United States v. Cotton*, 535 U.S. 625, 633 (2002) (upholding a sentence premised on a minimum drug threshold in the absence of a jury finding on the quantity because the evidence established "the conspiracy's involvement with far more" than the threshold amount).

Here, police officers seized 500 grams of heroin from a closet in Meeks's house, along with items of drug paraphernalia. Meeks did not contest the amount of heroin at trial. Rather, he argued that he did not have possession of the items in the closet. By finding him guilty of Count Nine, the jury must have found that the government proved possession. We have already rejected Meeks's sufficiency challenge on that count. Given the uncontroverted evidence of the amount of heroin—an amount far greater than the threshold under § 841(b)(1)(B)(i)—it appears beyond a reasonable doubt that a properly instructed jury would have found that the crime involved 100 grams or more of a substance containing heroin. [2] The five-year minimum would therefore have applied.

Meeks argues that the error affected his substantial rights because "[t]here is no certainty that the court would have imposed the same sentence had the mandatory minimum not been in play." (Meeks Br. at 34.) He bases his argument on *United States v. Bradley*, 581 F. App'x 249 (4th Cir. 2014) (per curiam), in which the Fourth Circuit reversed for plain error on an *Alleyne* issue. But in *Bradley*, the government argued that the defendant could not show prejudice because the district court would have imposed the same sentence even in the absence of a mandatory minimum. *Id.* at 253. The Fourth Circuit disagreed. *Id.* In the present case, there is no prejudice not because the sentence would necessarily have been the same if the mandatory minimum were not in play but based on a logically prior step: the mandatory minimum would have applied if the jury had been properly instructed because it appears beyond a reasonable doubt that the jury would have found that the crime involved 100 or more grams of heroin.

For these reasons, the district court's error did not affect Meeks's substantial rights. There is therefore no basis for reversal on this issue.

---

[2] For this same reason, Meeks's argument that the evidence was insufficient to trigger the enhanced penalties under 21 U.S.C. § 841(b)(1)(B), also fails.

VII.

Meeks argues that the district court erred in determining the amount of cocaine attributable to him for sentencing purposes.

The court attributed 3,305 grams of cocaine to Meeks. This figure was derived from over one kilogram of cocaine seized from Watson's home, plus two empty kilogram-sized wrappers with cocaine residue. When combined with the heroin, this led to a total marijuana equivalency of 1,206 kilograms, placing him in offense level 32. Given his criminal history category, this yielded a 121-to-151-month guideline range for Counts One (conspiracy with intent to distribute controlled substances), Nine (possession with intent to distribute heroin), and Ten (felon in possession of a firearm). Meeks argues that the court should have attributed only 303.8 grams of cocaine to him. This would have resulted in an offense level—after considering the retroactive amendments to U.S.S.G. § 2D1.1—of 21, giving rise to a guideline range of 78 to 97 months.

Meeks's sentencing argument blends several related but distinct issues. Though it claims that his sentence is "procedurally unreasonable," only part of his claim in fact refers to procedural reasonableness. We will separate his various arguments and address each in turn.

A.

Meeks's first claim is that the district court erred in attributing the cocaine found at Watson's home to Meeks. "Where a defendant is part of a 'jointly undertaken criminal activity' involving drugs, 'the defendant is accountable for all quantities of contraband with which [he] was directly involved and . . . all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that [he] jointly undertook.'" *United States v. Begley*, 602 F. App'x 622, 626 (6th Cir. 2015) (quoting U.S.S.G. § 1B1.3 cmt. 2); *see also United States v. Campbell*, 279 F.3d 392, 399 (6th Cir. 2002). A "jointly undertaken criminal activity"

includes, though is not limited to, a conspiracy. *United States v. Thomas*, 28 F. App'x 427, 431 (6th Cir. 2002) (citing U.S.S.G. § 1B1.3 cmt. 2).

We "must accept a district court's determination of the quantity of drugs attributable to a defendant for sentencing purposes unless that determination was clearly erroneous." *United States v. Dillard*, 505 F. App'x 516, 520 (6th Cir. 2012) (citing *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008)). "If the exact amount of drugs is undetermined, 'an estimate will suffice but . . . a preponderance of the evidence must support the estimate." *Jeross*, 521 F.3d at 570 (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)); *see also United States v. Gardner*, 417 F.3d 541, 546–47 (6th Cir. 2005). "[A] district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record." *Jeross*, 521 F.3d at 570 (citing *United States v. Brannon*, 7 F.3d 516, 520 (6th Cir. 1993)). That evidence "'must have a minimum level of reliability beyond mere allegation, and the court should err on the side of caution in making its estimate.'" *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004) (quoting *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir. 2000)).

Meeks argues that the evidence against him showed nothing more than "an inquiry about the price of cocaine." (Meeks Br. at 54.) And "[t]o the extent that Meeks may have been looking to buy cocaine or heroin . . . this amounted to no more than a potential buyer-seller relationship that does not constitute a conspiratorial relationship or even an act in furtherance of a conspiratorial relationship." (*Id.*)

We disagree. The district court did not clearly err in determining that the entire 3,305 of cocaine—both the cocaine found in Watson's home and the two kilograms that the district court determined had been present based on the empty wrappers—was within the scope of the conspiracy of which Meeks was a part and was reasonably attributable to Meeks. The court first

determined that "[w]ith respect to the 1,000 grams of cocaine that were seized from defendant Watson's residence, . . . [Meeks] did have actual knowledge of this quantity because the quantity was actually discussed by [Meeks] and Watson during the June 5, 2010 telephone conversation that was played during trial."  (DE 651, Sentencing Tr., Page ID 8110.)  The call included the following discussion:

> Watson: What's up with your nephew an' them?
> Meeks: Uhh, I talk to him, he, he wanna know how old she is.
> Watson: Shit.
> Meeks: So he want one though.
> Watson: Huh?
> Meeks: He gotta . . . he wanna know how old she is.
> . . .
> Watson: Thirt, thirty two an about to be at half that way.
> Meeks: Damn.  Can't do it for the thirty two?
> Watson: Nope.
> . . .
> Meeks: She pretty?
> Watson: She decent.
> . . .
> Meeks: But she, is she around right now?
> Watson: Yeah.
> Meeks: Okay, well I'm gonna have to get them sticks together.  Let me call him and let him know.
> . . . .

(DE 692, Phone Call Trs., Page ID 11358–59.)  The government offered testimony that cocaine goes by the term "girl."  (DE 678, Trial Tr., Page ID 9589.)  The district court also referred to a prior conversation, on June 1—one of many recorded conversations between Watson and Meeks that appeared to reference drugs—in which Watson told Meeks, "I'm working with you," and Meeks said, "I wanna build that back up so I can take care of you man."  (DE 692-2, Phone Call Trs., Page ID 11337.)  They then discussed a transaction involving Meeks's nephew, a topic to which they returned in the June 5 call.  The district court found by a preponderance of the

evidence that, taken together, these calls established more than just a negotiation over price: they showed that the one kilogram of cocaine was within the scope of the conspiracy. This conclusion was not clearly erroneous based on the evidence in the record.

Next, the district court found that the additional 2,305 grams of cocaine should also be attributed to Meeks. The court recognized that there was no evidence that Meeks had actual knowledge but that it was reasonably foreseeable that such a quantity would be a part of the conspiracy in which he participated. This was a correct interpretation of the law. *See Begley*, 602 F. App'x at 626. And the district court did not clearly err in its view of the evidence. The court relied, *inter alia*, on Watson's statement that "I done got it checked out and everything," which suggested that others were involved in the conspiracy; the references to other customers in the June 5 call; Watson's comments on June 2 that he had "to go grab it," and that he was "putting it together," which suggested he stored a quantity of cocaine somewhere; and discussions indicating that Meeks was bringing other customers to Watson. (DE 651, Sentencing Tr., Page ID 8116–17; *see also* DE 692-2, Phone Call Trs., Page ID 11337, 11339, 11350, 11352, 11358–59.) It was not clearly erroneous for the district court to find—in light of these conversations and given that Meeks specifically knew about one kilogram of cocaine—that it was reasonably foreseeable to someone in Meeks's position that Watson would have an additional quantity of cocaine of slightly more than two kilograms.

In sum, there was no error in the district court's conclusion that 3,305 grams of cocaine were either known to Meeks or reasonably foreseeable to him, and therefore attributable to him for sentencing purposes.

B.

The next component of Meeks's sentencing argument is the contention that there was insufficient evidence to support the district court's conclusion that—by a preponderance of the evidence—two kilograms of cocaine should be counted based on the empty wrappers that were found at Watson's house. As stated, the district court may make an estimate based on a preponderance of the evidence, erring on the side of caution. *Sandridge*, 385 F.3d at 1037.

We review this finding for clear error if the defendant has properly preserved the issue. *Jeross*, 521 F.3d at 570; *Sandridge*, 385 F.3d at 1037. Here, Meeks failed to object to the district court's determination that the wrappers indicated the presence of two additional kilograms. At the first sentencing hearing, the government argued: "[T]here were two empty kilo wrappers, empty but for the residue of cocaine. Kilo wrappers can also be scored . . . ." (DE 620, Meeks Sentencing Tr., Page ID 7930.) Meeks's counsel argued that the two kilograms should not be attributable to Meeks. That argument has already been considered. But he did not object—at any point during the remainder of the hearing, nor in his additional briefing, nor at the second sentencing hearing, including when asked the *Bostic* question[3]—to the finding that two additional kilos were *present* at Watson's house at some point in time. He did have the opportunity to object because it was clear that these two kilograms were being considered for sentencing purposes. The government mentioned the wrappers in discussing the total drug quantity at the first sentencing hearing, and the court's calculations at the second hearing made clear that it was including "2,305 grams of cocaine . . . from Watson's residence," (DE 651, Sentencing Tr., Page ID 8108), the vast majority of which was not based on actual cocaine found

---

[3] "If, at the conclusion of the sentencing hearing, the judge asks the parties whether they have any objections to the proposed sentence that have not previously been raised, and the relevant party does not object, then plain-error review applies on appeal to those arguments not preserved in the district court." *United States v. Houston*, 529 F.3d 743, 750 (6th Cir. 2008) (citing *Vonner*, 516 F.3d at 385).

at the scene. Meeks could therefore have at least argued that the evidence was insufficient to find that the two additional kilograms had been present at the scene. He failed to raise the issue at all.

We therefore review only for plain error. *United States v. Houston*, 529 F.3d 743, 750 (6th Cir. 2008). Meeks's argument fails here because the district court did not commit an error, let alone a plain error. *See Vonner*, 516 F.3d at 386 (stating that the court will only find such an error "where the error is so plain that the trial judge was derelict in countenancing it" (internal quotation marks omitted)). In appropriate cases, this court has upheld an estimate based on empty packaging. *United States v. Phipps*, 524 F. App'x 209, 213–14 (6th Cir. 2013) (citing similar holdings from six other circuits); *United States v. Smartt*, 60 F. App'x 549, 550–51 (6th Cir. 2003) (per curiam). It was appropriate here to determine, on a preponderance of the evidence, that the two empty wrappers, each kilogram-sized and containing cocaine residue, had previously contained a total of two kilograms of cocaine. This conclusion was not plainly erroneous.

C.

The final aspect of Meeks's sentencing argument genuinely relates to procedural reasonableness. He argues: "the district court gave no indication that it approximated drug weight from any source, let alone two empty wrappers." (Meeks Reply at 29; *see also* Meeks Br. at 49–51.) Procedural unreasonableness includes "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation for the Guideline range." *Gall v. United States*, 552 U.S. 38, 51 (2007).

In order to preserve a procedural-reasonableness issue, challenging "the adequacy of the court's explanation for the sentence," the defendant must specifically object to the explanation, *Vonner*, 516 F.3d at 386, and must object with sufficient specificity to give the district court the opportunity to correct the alleged error and to give this court a sufficiently detailed record to review, *United States v. Simmons*, 587 F.3d 348, 356–58 (6th Cir. 2009). Despite being asked the *Bostic* question, Meeks did not mention the issue. We therefore review only for plain error. *Vonner*, 516 F.3d at 386.

Meeks is correct to note that the district court failed to explain that two kilograms of the cocaine that it was counting for sentencing purposes derived from the wrapper containing cocaine residue. The court referred on several occasions to "2,305 of cocaine *seized from* Watson's residence," (DE 651, Sentencing Tr., Page ID 8108 (emphasis added).) This is somewhat confusing on its face because the evidence showed that officers had clearly not seized that quantity of cocaine.

In context, however, it is clear that the court was deriving two kilograms from the empty wrappers, as it was entitled to do. *See Phipps*, 524 F. App'x at 213–14. Meeks bases his procedural reasonableness argument entirely on the second sentencing hearing, which took place in May 2013. But at a prior sentencing hearing, in January of that year, the court and parties discussed the calculations in greater depth. The government explained: "[F]or the purposes of calculation . . . we included . . . the two empty wrappers . . . containing cocaine residue, each representing a thousand grams . . . ." (DE 620, Sentencing Tr., Page ID 7930.) Defense counsel did not indicate any disagreement with the calculation based on the wrappers, but argued only that the drugs found at Watson's home were not foreseeable to Meeks. The district court ordered several rounds of supplemental briefing on various sentencing issues. In one of those orders, the

court specifically required the government to brief the question of whether "the Court [could] attribute a quantity of drugs to Defendant based on the capacity of a wrapper in which drug residue is found." (DE 641, Order, Page ID 8071.) The court's question was explicitly directed to the "two kilogram sized wrappers" that the government asked the court to consider. (*Id.*) The government responded to this question in a sentencing memorandum. Thus, when the district court referred at the second and final sentencing hearing to "2,305 seized from Watson's residence," it is obvious that it was including two kilograms based on the wrappers.

As a result, we question whether the district court's explanation of its calculation was even an error. We need not decide whether it was because any alleged error did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings," *Olano*, 507 U.S. at 732 (internal quotation marks omitted). It is abundantly clear that the district court was rationally basing it calculation of cocaine quantity based in part on the two wrappers. The court's failure to speak with absolute precision at the final sentencing hearing does not detract from this conclusion. This is not, therefore, an instance in which we would exercise our discretion to reverse the sentence even if it involved an error.

VIII.

Finally, Watson argues that his life sentence violates his Eighth Amendment right against cruel and unusual punishments. We review a constitutional challenge to a sentence *de novo*. *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009).

The district court imposed the mandatory life sentence under 21 U.S.C. §§ 841(b) and 851 based on Watson's two prior convictions for serious drug offenses. Watson contends that one of those convictions—a 1994 Michigan conviction for possession of cocaine—cannot be used as a predicate for the § 841(b) without violating his Eighth Amendment rights. He notes

that the Supreme Court's Eight Amendment jurisprudence has recognized the inherent differences between adults and juveniles in determining the bounds of proportionate punishments. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (holding that the Eighth Amendment bars the use of the death penalty against a defendant who was under eighteen at the time of the crime and explaining that the differences between adults and juveniles "render suspect any conclusion that a juvenile falls among the worst offenders"); s*ee also Graham v. Florida,* 560 U.S. 48, 82 (2010) (holding that the Eighth Amendment prohibits "the imposition of a life without parole sentence on a juvenile offender who did not commit homicide"); *Miller v. Alabama*, 132 S. Ct. 2455, 2460 (2012) (holding that the Constitution prohibits mandatory life-without-parole sentences for juveniles, even those convicted of homicide).

But although Watson raises this argument "to preserve [it] for further review," he acknowledges that this court's binding precedent leaves no doubt that mandatory life sentences may be imposed upon defendants in Watson's position without offending the Eighth Amendment. Sentences are unconstitutional only when they are "grossly disproportionate" to the crime, *United States v. Olan-Navarro*, 350 F.3d 551, 554 (6th Cir. 2003) (internal quotation marks omitted), and the "imposition of a life sentence without parole for a third felony drug conviction is not 'grossly disproportionate' to the crime," *United States v. Kelsor*, 665 F.3d 684, 701 (6th Cir. 2011). And we have specifically held that such a sentence is consistent with the Eighth Amendment even if one of the prior convictions occurred when the defendant was under eighteen. *United States v. Graham*, 622 F.3d 445, 461–64 (6th Cir. 2010). We are bound by *Graham* and we affirm Watson's sentence.

IX.

For the above reasons, we affirm the judgment of the district court.